PEOPLE v WILLING

Docket No. 251786. Submitted April 5, 2005, at Detroit. Decided June 28, 2005, at 9:25 a.m.

Aaron C. Willing was convicted by a jury in the Oakland Circuit Court of conspiracy to deliver 225 to 649 grams of a controlled substance after arranging to sell nine ounces of cocaine to an undercover police officer. The defendant had not been present for the first day of the hearings on entrapment and the voluntariness of his statements to the police. On the second day of the hearings, the defendant's attorney had advised the court that the defendant wanted to represent himself. Following an exchange in which the defendant asked for the opportunity to retain other counsel or have another attorney appointed, the court, Fred M. Mester, J., had continued the hearings with the defendant representing himself, with his appointed attorney as standby counsel. The court had subsequently determined that the defendant was not entrapped and that his statements were voluntary. After the jury was empanelled, the court had elicited a valid waiver of the right to counsel from the defendant, and the defendant had continued to represent himself, with standby counsel, through the trial. The defendant appealed his conviction, arguing that he did not waive his right to counsel until after the trial began and that he was denied his right to counsel at critical stages of the proceedings.

The Court of Appeals *held*:

1. Before granting a defendant's request for self-representation, the trial court must determine (1) that the defendant's request is unequivocal, (2) that the defendant is asserting the right knowingly, intelligently, and voluntarily after being informed of the dangers and disadvantages of self-representation, and (3) that the defendant's self-representation will not disrupt, unduly inconvenience, and burden the court and the administration of the court's business. The defendant did not unequivocally waive his right to counsel before the jury was empanelled. While his attorney stated that the defendant wanted to represent himself, the defendant only asked for an adjournment to retain an attorney or for another attorney to be appointed. The defendant

was not directly asked, nor did he directly state, that he wished to represent himself. The defendant's waiver of the right to counsel was ineffective.

2. A total deprivation of the right to counsel at a critical stage of a criminal proceeding is a structural error requiring automatic reversal. It cannot be harmless error if the effect of the deprivation pervaded the entire proceeding. The defendant experienced a total deprivation of counsel despite the fact that he was assisted by standby counsel. Standby counsel cannot be considered counsel within the meaning of the Sixth Amendment's right to the assistance of counsel. Standby counsel does not bear the responsibility for the accused's defense and does not represent the defendant. Moreover, the defendant was deprived of counsel during a critical stage of the proceedings. The hearings were the defendant's only opportunities to argue that his statements should not be admitted or to present his entrapment defense, which would be a complete defense to the charge. The results of the trial court's rulings following the hearings affected the entire proceeding.

Reversed.

1. CRIMINAL LAW — RIGHT TO COUNSEL — WAIVER.

A defendant's request for self-representation must be unequivocal; a defendant's waiver of the right to counsel is not unequivocal when the defendant is not directly asked, and does not directly state, that the defendant wishes to represent himself or herself, but only states a desire to retain a different attorney or have a different attorney appointed.

2. CRIMINAL LAW — RIGHT TO COUNSEL — WAIVER — STANDBY COUNSEL.

The assistance of standby counsel following an ineffective waiver of the right to counsel does not prevent the defendant from experiencing a total deprivation of counsel during a critical stage of a criminal proceeding, and does not render the ineffective waiver a harmless error.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *David G. Gorcyca*, Prosecuting Attorney, *Joyce F. Todd*, Chief, Appellate Division, and *Kathryn G. Barnes*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Gary L. Rogers* and *Jonathan R. Sacks*) for the defendant on appeal.

Before: WHITBECK, C.J., and ZAHRA and OWENS, JJ.

WHITBECK, C.J.

### I. OVERVIEW

Defendant Aaron Willing appeals by right his jury conviction of conspiracy to deliver 225 to 649 grams of a controlled substance[1] after arranging to sell nine ounces of cocaine[2] to an undercover police officer.[3] Willing, who represented himself with the assistance of an appointed attorney, argues that he did not waive his right to counsel until after trial had begun, and that the trial court improperly allowed portions of the trial to proceed without Willing's presence. We reverse, because Willing experienced a total deprivation of counsel during a critical stage of the proceedings.

### II. BASIC FACTS AND PROCEDURAL HISTORY

#### A. FACTUAL BACKGROUND

The facts of this case are essentially undisputed. Martin Lavin, an undercover officer with the Royal Oak police, learned from a confidential informant that the informant and Willing had discussed selling drugs while they were incarcerated together. The informant gave Willing's telephone number to Lavin, and, after Willing was released from jail, Lavin began calling to ask if

---

[1] MCL 333.7401(2)(a)(ii), before amendment by 2002 PA 665.

[2] Nine ounces is equal to 255.15 grams.

[3] Willing urges this Court to amend the original judgment of sentence, which erroneously stated that he was convicted of conspiracy to deliver *449 to 999* grams of cocaine rather than 225 to 649 grams. However, since Willing filed his brief on appeal, the trial court has issued an amended judgment of sentence that reflects the correct amount. Accordingly, we need not address this issue.

Willing would sell him cocaine. Willing initially told Lavin that he could not procure the amount Lavin was seeking and did not want to participate. However, in a three-way telephone conversation with Lavin, Willing, and Willing's friend Danny Potter on December 30, 2001, Willing agreed to sell Lavin cocaine.

In a tape-recorded call later that day, Lavin asked Willing whether he should bring enough money for 4½ or nine ounces, and Willing responded that he had "two different guys checking on it" who "both got it," and he was expecting a call back with the price. When Lavin called back a second time, Willing told Lavin that he had "never bought nine before," but thought the price would be "seventy-four," meaning $7,400. Willing told Lavin that "he's on his way out here right now, . . . I'm going to talk to him, check it out, get a price, get a ticket on it . . . give me fifteen more minutes and I'll let you know." When Lavin asked how it would "go down," Willing responded that it would be "me, you, him, and probably one of his boys. And my girl." Willing suggested they meet at a bar near I-75 and M-24, and Lavin agreed.

The next day, Willing called Lavin and told him that he "got it for all nine of them," meaning all nine ounces. On January 3, 2002, Lavin called Willing, who asked him if he knew what a "key," or a kilogram of cocaine, looked like. When Lavin responded that he did, Willing said, "All right, this thing, it was about one or two inches thick and it was the length of the key," and it looked like a "flat chunk" that had been broken directly off the key. Willing told Lavin that a friend would be driving him to the meeting place, which they had changed to a fast-food restaurant near Eight Mile Road and Greenfield.

Lavin, who was wearing a hidden microphone, drove to the meeting place with undercover officer Kenneth

Bean to meet Willing, who had told Lavin that he and his friend would arrive in a Dodge Stratus. The friend was Danny Potter, who had participated in the December 30, 2001, conversation with Willing and Lavin. Lavin and Willing walked over to Potter's parked car, and Willing got into the passenger seat. Willing told Lavin to expect the man with the drugs to arrive in a Grand Marquis between 5:30 and 6:00 p.m. As they waited, Willing offered Lavin the keys to Potter's car to assure him that Potter could not drive away until the deal was completed. Sometime after 6:00 p.m., a man named London arrived with a bag of a white powdery substance. London showed Lavin the bag and allowed him to weigh it, but would not let him smell it. Lavin then gave the signal for his backup officers to move in, and they took Willing, Potter, and London into custody. As they did so, Lavin heard London say, "it's flour." A field test confirmed that the substance in the bag was not cocaine.

After being taken to the police station, Willing waived his *Miranda*[4] rights, and Lavin interviewed him. According to Lavin, Willing told him that he knew he could get cocaine through Potter, who had a source from whom he, in turn, could get it. Willing told Lavin that he had expected that source to be at the arranged meeting place at the same time Lavin, Willing, and Potter arrived. Instead, Willing and Potter drove to the arranged place and "waited for the stuff to arrive," which took about forty-five minutes. Willing's written statement also indicated that "[t]he purchase agreement was nine ounces of cocaine." Lavin asked whether Willing knew that the substance to be delivered was flour, and, according to Lavin, Willing responded, "I had no idea. I thought it was going to be cocaine." After a

---

[4] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

preliminary examination, Willing was charged with conspiracy to deliver cocaine.

### B. PRETRIAL MOTIONS AND SUBSTITUTION OF COUNSEL

Before trial, Willing moved for a *Walker*[5] hearing to exclude the statement he gave Lavin at the police station, and also moved for a finding that Lavin had entrapped him into agreeing to sell cocaine. However, before the hearings on these motions could take place, the prosecution filed a motion to disqualify Willing's retained attorney on the ground that he had previously represented the confidential informant on drug-related charges. The trial court granted the motion to disqualify Willing's attorney, and appointed attorney Scott Neumann to represent Willing.

When the entrapment and *Walker* hearings began on March 10, 2003, Willing was not present, although Neumann stated that he had told Willing to be there on that date. Neumann waived Willing's appearance, and the trial court proceeded with the hearings. Lavin and the confidential informant both testified, and the trial court was given the tapes of Willing's phone calls and Willing's signed waiver of rights. The trial court declined to rule on either motion until Willing could appear and testify.

At the beginning of the resumed hearings, Neumann told the trial court that Willing wished to dismiss him and proceed pro se. The following exchange occurred:

> [*Defense Counsel*]: There is one issue as well. My client advised me that he would like to represent himself in this matter. I have explained to him the consequences of that and the options. That is his sound decision, unintelligently [sic]. Before I do—

---

[5] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

*The Court*: This is Mr. Willing; is that correct?

[*Defense Counsel*]: Before I do anything, your Honor, he did request from me—he would like a request from this Court another court appointed attorney. I'll let him address that issue himself.

*The Court*: Mr. Willing?

*Mr. Willing*: Your Honor, I have had, as far as me and Mr. Neumann go, our relationship has been miniscule [sic], if at all. Probably since he's taken the case we've probably had contact a total four or five hours. I haven't been pleased with our relationship. He, he hasn't, he hasn't given me the representation that I feel that I deserve.

As far as representing myself, I would respectfully ask the Court if he—if you could grant an adjournment so that I can try and retain my own attorney so I can have the defense that I want. And if that's not possible, if you could grant me another court appointed attorney that I will be able to get along with and actually have a solid defense that I feel I'm worth.

*The Court*: What is the charge here?

[*Prosecutor*]: Your Honor, this is a conspiracy to deliver between 225 to 649 grams of cocaine. The maximum sentence is I believe 30 years, and it's a mandatory minimum of 20 years, your Honor.

*Mr. Willing*: Which is why I'm so adamant about my defense.

*The Court*: Mr. Neumann is one of the finest young attorneys around, and he is very thorough in regards to his conduct with his clients. I'm going to continue him. You are—you may represent yourself, but he will be there to counsel you as you proceed to try to represent yourself in this trial.

At this point, the prosecutor told the trial court that Willing had retained an attorney who was dismissed for having a conflict of interest, and expressed the opinion that Willing had the right to hire an attorney if he had the means to do so. The trial court asked Willing

whether he had the means, and Willing responded that he had spent more than $17,000 on his previous attorney, but hoped to retain an attorney for "a couple thousand dollars." The trial court responded:

*The Court*: You're going to retain an attorney on $2,000 on a case–

*Mr. Willing*: No.

*The Court*:—that has a minimum of 20 years?

*Mr. Willing*: No. I don't think I will be able to retain him for 2,000, but I believe to be able to retain someone between 5 and 10.

*The Court*: You have an attorney here who knows as much about the system as any other attorney does, who knows enough about the rules of evidence than anyone does.

*Mr. Willing*: I understand.

*The Court:* And this was the date and time set for trial.

*Mr. Willing*: I do, I do understand that, your Honor.

*The Court*: And I thought we had a long discussion, what was it, two or three weeks ago about this date being the date certain, did we not?

*[Prosecutor]*: We did, your Honor. It was last week, earlier in the week.

*[Defense Counsel]*: That's correct, your Honor.

*The Court*: And I think you were so advised, were you not?

*Mr. Willing*: I, I was, your Honor. I'm not asking you to do anything you wouldn't want to do. I'm just asking you to—

*The Court*: Well, I'm trying to do what is right.

*Mr. Willing*: That's, that's—

*The Court*: For the system and for you.

*Mr. Willing*:—the problem right there.

*The Court*: As well, because I know that I have the greatest confidence in Mr. Scott Neumann. He, he understands the system and I think he'll represent you as well as possible. We have this date set for trial. We'll go to trial.

Mr. Neumann will sit to the right of you and you may ask him for any counsel in regards to anything pertaining to the procedure of this case and you may counsel with him as you deem appropriate.

Thank you.

Let's go through with the hearing.[6]

The combined hearings proceeded, with Lavin repeating the testimony he had previously given, Willing questioning himself, and Willing calling his girlfriend to testify about the frequency of Lavin's calls during December and Willing's responses to those calls. After hearing the testimony, the trial court ruled that Willing was not entrapped and that his statements to the police were voluntary and admissible.

C. THE TRIAL

The trial began on August 5, 2003. The trial court decided to try Willing and Potter simultaneously, but before two different juries. After Willing's jury was empanelled, the trial court elicited a valid waiver of counsel from Willing and confirmed that he intended to proceed pro se with Neumann acting as standby counsel.

---

[6] Although this exchange took place in March 2003, the trial court did not enter an order reflecting Neumann's appointment as standby counsel or Willing's decision to proceed pro se until well after trial. The written date on the initial order was October 26, 2003, but the order was date-stamped on October 6, 2003. The trial court later set aside this misdated order, and entered a new order stating that Neumann began his appointed representation on February 20, 2003, and continued in an advisory capacity until November 12, 2003.

Lavin, Bean, and two other officers who participated in the undercover operation testified for the prosecution. Transcripts of six telephone conversations between Willing and Lavin were admitted, and the tapes Lavin had made of those conversations were played to the jury. Willing testified in his own defense, with Neumann, acting as standby counsel, conducting the direct examination. Willing testified that when the confidential informant and Lavin first called him, he told them he wanted nothing to do with the deal. According to Willing, Lavin continued to call and ask him about obtaining drugs every three or four days. On December 30, 2001, when Lavin called while Willing happened to be on the phone with his friend Danny Potter, Willing realized that he and Potter "might be able to make some money real quick," and Willing agreed to deliver drugs to Lavin.

Willing testified that while the original plan was to deliver actual drugs to Lavin, at some point he and Potter decided to take Lavin's money without giving him any drugs in return, then run away. Willing acknowledged that, judging by the tape-recorded conversations, it sounded as though he was setting up an actual drug deal with Lavin; however, Willing explained that he had to make the deal sound as real as possible to get Lavin to give him the money. Willing testified that, contrary to what he told Lavin on the phone, he never actually saw the cocaine that was to be delivered. Willing testified that his intention to "rip Lavin off" rather than deliver drugs was evident from the fact that he repeatedly tried to get Lavin to agree to give him the money without seeing the drugs and, when Lavin refused, Willing tried to back out of the deal. When asked why Willing and Potter would bother getting London involved if their intent was to rip Lavin off, Willing testified that Potter did not contact London

until it became clear that Lavin would not part with the money without seeing any drugs.

With respect to his postarrest statement to the police, Willing testified that Lavin told him to add the statement that the purchase agreement was for nine ounces of cocaine. Willing explained that he did not tell the police that his intent was to cheat or steal from Lavin at this juncture because he "figured it was pretty obvious because there was no cocaine delivered." Willing further explained that he feared that Lavin would have beaten him if he knew that Willing had planned to cheat or steal from him because the police had treated Willing roughly while arresting him and driving him to the station.

Willing's closing argument to the jury stated that it was not enough for the prosecution to show that Willing had an agreement with Lavin, because Lavin was a police officer. Rather, the prosecution had to show that Willing had an agreement with Potter to sell Lavin cocaine. Willing asserted that he did not have the intent to sell Lavin cocaine, as shown by the fact that no cocaine was found at the scene, and the prosecution failed to prove otherwise.

The jury convicted Willing of conspiring to deliver cocaine.

### III. WAIVER OF RIGHT TO COUNSEL

#### A. STANDARD OF REVIEW

When assessing the validity of a defendant's waiver of the right to counsel, we review de novo the entire record to determine whether the trial court's factual findings regarding the waiver were clearly erroneous.[7]

---

[7] *People v Williams*, 470 Mich 634, 640; 683 NW2d 597 (2004).

"[T]o the extent that a ruling involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo."[8]

### B. LEGAL STANDARDS

Defendants who face incarceration are guaranteed the right to counsel at all critical stages of the criminal process by the Sixth Amendment,[9] which applies to the states through the Due Process Clause of the Fourteenth Amendment.[10] Both federal and state law also guarantee a defendant the right of self-representation,[11] although this right is subject to the trial court's discretion.[12]

Before granting a defendant's request to represent himself or herself, the trial court must determine that the three factors set forth in *People v Anderson* have been met: (1) the defendant's request is unequivocal, (2) the defendant is asserting the right knowingly, intelligently, and voluntarily after being informed of the dangers and disadvantages of self-representation, and (3) the defendant's self-representation will not disrupt, unduly inconvenience, and burden the court and the administration of the court's business.[13] In addition, a

---

[8] *People v Russell*, 471 Mich 182, 187; 684 NW2d 745 (2004).

[9] See *Williams, supra* at 641, citing *Maine v Moulton*, 474 US 159, 170; 106 S Ct 477; 88 L Ed 2d 481 (1985).

[10] See *Williams, supra* at 641, citing *Gideon v Wainwright*, 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963).

[11] See *People v Adkins (After Remand)*, 452 Mich 702, 720; 551 NW2d 108 (1996), overruled in part on other grounds by *Williams, supra* at 641 n 7; *Faretta v California*, 422 US 806; 95 S Ct 2525; 45 L Ed 2d 562 (1975). See also Const 1963, art 1, § 13; MCL 763.1.

[12] See *People v Dennany*, 445 Mich 412, 427; 519 NW2d 128 (1994); *People v Anderson*, 398 Mich 361, 366; 247 NW2d 857 (1976).

[13] *Anderson, supra* at 367-368. See also *Russell, supra* at 190 (applying the *Anderson* factors).

trial court must satisfy the requirements of MCR 6.005(D), which prohibits the trial court from allowing the defendant to make an initial waiver of the right to counsel without first:

> (1) advising the defendant of the charge, the maximum possible prison sentence for the offense, any mandatory minimum sentence required by law, and the risk involved in self-representation, and

> (2) offering the defendant the opportunity to consult with a retained lawyer or, if the defendant is indigent, the opportunity to consult with an appointed lawyer.[14]

A trial court must substantially comply with the *Anderson* factors and the court rule for a defendant to effect a valid waiver of the right to counsel.[15]

When determining whether the requirements were met, we " ' "indulge every reasonable presumption against waiver of fundamental constitutional rights." ' "[16] " ' "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver." ' "[17]

### C. APPLYING THE STANDARDS

Willing argues that he did not waive his right to counsel for the pretrial proceedings; rather, he re-

---

[14] MCR 6.005(D); see also *Russell, supra* at 190-191.

[15] *Russell, supra* at 191-192, citing *Adkins (After Remand), supra* at 726.

[16] *Williams, supra* at 641, quoting *Johnson v Zerbst*, 304 US 458, 464; 58 S Ct 1019; 82 L Ed 1461 (1938), quoting *Aetna Ins Co v Kennedy*, 301 US 389, 393; 57 S Ct 809; 81 L Ed 1177 (1937).

[17] *Adkins (After Remand), supra* at 721, quoting *People v Dunn*, 380 Mich 693, 698; 158 NW2d 404 (1968), quoting *Carnley v Cochran*, 369 US 506, 516; 82 S Ct 884; 8 L Ed 2d 70 (1962).

quested to retain counsel or have new counsel appointed for him, and the trial court denied these requests. Willing maintains that he did not waive his right to counsel until after the jury was selected and given preliminary instructions on the first day of trial. Thus, Willing asserts that he was denied his right to counsel at the *Walker* and entrapment hearings, as well as at jury voir dire.

The trial court allowed Willing to proceed pro se with standby counsel at the beginning of the second day of the *Walker* and entrapment hearings after engaging in the colloquy recited above. The question is whether Willing unequivocally waived his right to counsel during this exchange, as *Anderson* requires.[18] We begin by noting that Willing never expressed the desire to represent himself or to waive his right to counsel before the trial court. Although Willing's *attorney* stated that Willing wanted to represent himself, the only thing Willing said on the subject was that he would either like an adjournment in order to retain another attorney or, alternatively, another court-appointed attorney.

The Michigan Supreme Court recently addressed the waiver issue under somewhat similar circumstances. In *People v Russell*, the Court determined that the defendant's purported waiver of counsel was not unequivocal where he "clearly sought appointment of *another* trial counsel . . . ."[19] It is clear from the record here that Willing also clearly sought either the appointment of another trial counsel or an adjournment to enable him to retain another attorney. However, the defendant in *Russell* explicitly and consistently rejected the suggestion that he wanted to represent himself,[20] which Will-

---

[18] *Anderson, supra* at 367; *Russell, supra* at 190, 193.

[19] *Russell, supra* at 192 (emphasis in original).

[20] *Id.*

ing did not do. Because the defendant's unequivocal rejection of self-representation furnished a partial basis for the *Russell* Court's ruling, we are reluctant to conclude that *Russell* alone compels the conclusion that Willing's purported waiver was ineffective.

An examination of *People v Suggs* the companion case to *People v Adkins (After Remand)*, aids our analysis. In *Suggs*, three months before trial began, defense counsel informed the trial court that the defendant had sent him a letter requesting to terminate the representation and to represent himself instead.[21] The trial court granted defense counsel's request to withdraw and, without any inquiry, told the defendant that he could represent himself.[22] Before trial began, the trial court questioned the defendant about his decision to represent himself, and warned him about the hazards of doing so.[23] When the trial court asked whether the defendant still wished to represent himself, the defendant responded, "Yes," but then went on to state, "It's not that I don't want an attorney to represent me, it's just that [defense counsel] never spoke to me. I had a trial date and never had a chance to talk to my attorney. I couldn't understand it, it's unprofessional."[24] The trial court responded that it had no problem with the defendant representing himself, but that it also had an obligation to warn him of the pitfalls and to "have you unequivocally indicate on the record you understand those and you do wish to represent yourself."[25] The defendant responded, "I understand—I understand

---

[21] See *Adkins (After Remand), supra* at 714-715.

[22] *Id.* at 715.

[23] *Id.* at 716-717.

[24] *Id.* at 718.

[25] *Id.* at 732.

what you said, yes."[26] While acknowledging that the trial court "could have responded better than it did to the defendant's hesitation,"[27] the Court concluded that the trial court had substantially complied with the waiver of counsel procedures, reasoning that the defendant unequivocally waived his right to counsel by first stating, "Yes," then reaffirming his desire to represent himself after making the comment, "It's not that I don't want an attorney . . . ."[28]

In this case, by contrast, Willing was not directly asked, nor did he directly state, that he wished to represent himself. Instead, he only stated his desire to retain a different attorney or have a different attorney appointed. Under these circumstances, we conclude that Willing did not unequivocally waive his right to counsel.

### D. APPLICATION OF HARMLESS ERROR ANALYSIS

The next question is whether Willing's ineffective waiver may be subject to harmless error analysis. When, as here, the error implicates a constitutional right, we must determine whether that error is structural or nonstructural.[29] If the error is structural, we must reverse.[30] If the constitutional error is nonstructural, we need not reverse if it was harmless beyond a reasonable doubt.[31]

---

[26] *Id.*

[27] *Id.* at 733 n 29.

[28] *Id.* at 732-733.

[29] *People v Duncan*, 462 Mich 47, 51; 610 NW2d 551 (2000).

[30] See *Neder v United States*, 527 US 1, 8; 119 S Ct 1827; 144 L Ed 2d 35 (1999); *People v Anderson (After Remand)*; 446 Mich 392, 405; 521 NW2d 538 (1994).

[31] *Id.* at 405-406.

Willing had the full assistance of appointed counsel until the second day of his combined *Walker* and entrapment hearings, at which point the trial court ordered appointed counsel to continue in a standby capacity while Willing represented himself. It is well established that a total or complete deprivation of the right to counsel at a critical stage of a criminal proceeding is a structural error requiring automatic reversal.[32] While the harmless error doctrine is not entirely inapplicable to ineffective waivers of the right to counsel, it has been limited to cases in which the effect of the deprivation of counsel does not "pervade the entire proceeding"[33]—for example, cases in which "the evil caused by a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial."[34] Thus, we must determine whether Willing's ineffective waiver resulted in a total or complete deprivation of his right to counsel, whether this total deprivation occurred during a critical stage of the proceeding, and whether the effect of the deprivation pervaded the entire proceeding.

The prosecution first argues that, to warrant reversal on the basis of a defective waiver of the right to counsel, Willing must show prejudice. However, the case the prosecution cites for this proposition applies only to

---

[32] See *United States v Cronic*, 466 US 648, 659 n 25; 104 S Ct 2039, 80 L Ed 2d 657 (1984) (The United States Supreme Court has "uniformly found constitutional error without any showing of prejudice when counsel was . . . totally absent . . . during a critical stage of the proceeding."); *Anderson (After Remand)*, *supra* at 405, citing *Gideon v Wainwright*, 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963). See also *Russell*, *supra* at 194 n 29 ("The complete denial of counsel at a critical stage of a criminal proceeding is a structural error that renders the result unreliable, thus requiring automatic reversal.").

[33] *Satterwhite v Texas*, 486 US 249, 256; 108 S Ct 1792; 100 L Ed 2d 284 (1988).

[34] *Id.* at 257.

waivers of the right to counsel at *subsequent* proceedings when a valid waiver had already been procured at a previous proceeding.[35] As this Court explained, the holding in that case does not apply to cases in which the *initial* waiver of the right to counsel is at issue.[36] Accordingly, this argument is without merit.

The prosecution next argues that the presence of standby counsel prevented Willing from experiencing a total deprivation of counsel, and that therefore any error resulting from an ineffective waiver was nonstructural. To support this position, the prosecution relies solely on a footnote from Justice BOYLE's opinion concurring in part and dissenting in part in *People v Dennany*, in which she observed that

> where, as here, the issue is whether a trial court obtained a valid waiver of counsel before allowing a defendant to proceed pro se, federal circuit courts have found a defective waiver to be harmless error when an examination of the whole record indicates no reasonable possibility that the defendant would have been found not guilty had he been represented by counsel. *United States v Gipson*, 693 F2d 109, 112 (CA 10, 1982), cert den 459 US 1216 (1983); *Richardson v Lucas*, 741 F2d 753, 757 (CA 5, 1984). The harmless error approach seems especially appropriate in cases such as the present, in which a defendant receives advice throughout the trial from standby counsel, the same counsel who would have represented the defendant had he not asserted his desire to proceed pro se.[37]

Justice BOYLE's opinion was joined by only one other justice, and is therefore not precedentially binding.[38]

---

[35] See *People v Lane*, 453 Mich 132, 139-140; 551 NW2d 382 (1996).

[36] See *People v Belanger*, 227 Mich App 637, 643 n 1; 576 NW2d 703 (1998).

[37] *Dennany, supra* at 468-469 n 13.

[38] See, e.g., *People v Justice*, 216 Mich App 633, 643 n 7; 550 NW2d 562 (1996).

Having examined the authorities on which it relied, we do not find it persuasive, either for the proposition that a defective waiver may be treated as harmless error or that the presence of standby counsel renders harmless error analysis applicable.

Justice BOYLE's opinion relied on the federal appellate decisions in *Gipson* and *Richardson*, but these cases have since been either directly or implicitly overruled. The Tenth Circuit Court of Appeals overruled *Gipson* after concluding that the United States Supreme Court's decisions in *Rose v Clark*[39] and *Penson v Ohio*[40] rendered harmless error analysis inapplicable to invalid waivers of counsel.[41] *Rose* involved the application of harmless error analysis to an erroneous jury instruction, not the denial of counsel,[42] but it contained the statement that "[h]armless-error analysis thus presupposes a trial at which the defendant, *represented by counsel*, may present evidence and argument before an impartial judge and jury."[43] *Penson* involved an indigent defendant whose appellate counsel withdrew after certifying that the defendant's appellate arguments were meritless.[44] In refusing to apply harmless error analysis, the Court rejected the notion that the defendant's interests were adequately represented by his codefendant's appellate attorney, stating that a criminal defendant "is entitled to a single-minded advocacy for which the mere possibility of a coincidence of interest with a represented codefendant is an inadequate proxy."[45]

---

[39] *Rose v Clark*, 478 US 570; 106 S Ct 3101; 92 L Ed 2d 460 (1986).

[40] *Penson v Ohio*, 488 US 75; 109 S Ct 346; 102 L Ed 2d 300 (1988).

[41] See *United States v Allen*, 895 F2d 1577, 1579-80 (CA 10, 1990).

[42] See *Rose, supra* at 579-580.

[43] *Id.* at 578 (emphasis added).

[44] See *Penson, supra* at 77-79.

[45] *Id.* at 87.

The Tenth Circuit's decision to overrule *Gipson* cast doubt on the validity of the Fifth Circuit's position in *Richardson,* not only because that decision similarly predated *Rose* and *Penson,* but also because *Gipson* was the only authority the *Richardson* court had cited in support of its application of harmless error analysis.[46] Of particular import to the present case is the fact that, when the Fifth Circuit subsequently was called on in *United States v Taylor*[47] to determine whether a defendant who had the benefit of standby counsel was required to show prejudice from his lack of representation, it held that he did not. As the *Taylor* court explained:

> Given the limited role that a standby attorney plays, we think it clear that the assistance of standby counsel, no matter how useful to the court or the defendant, cannot qualify as the assistance of counsel required by the Sixth Amendment. There can be no question that the roles of standby counsel and full-fledged defense counsel are fundamentally different. The very definition of full-fledged counsel includes the proposition that the counselor, and not the accused, bears the responsibility for the defense; by contrast, the key limitation on standby counsel is that such counsel *not be responsible*—and not be perceived to be responsible—for the accused's defense. Indeed, in many respects, standby counsel is not counsel at all, at least not as that term is used in the Sixth Amendment.
>
> . . . The defendant preserves actual control over the case he presents to the jury: standby counsel cannot substantially interfere with any significant tactical decisions, cannot control the questioning of witnesses, and cannot speak in place of the defendant on any matter of importance. Standby "counsel" is thus quite different from regular counsel. Standby counsel does not *represent* the defendant. The defendant represents himself, and may or may not

[46] See *Richardson, supra* at 757.

[47] *United States v Taylor,* 933 F2d 307 (CA 5, 1991).

seek or heed the advice of the attorney standing by. As such, the role of standby counsel is more akin to that of an observer, an attorney who attends the trial or other proceeding and who may offer advice, but who does not speak for the defendant or bear responsibility for his defense. Thus, as useful as standby counsel may be when a defendant wishes to represent himself, this Court holds that standby counsel is not "counsel" within the meaning of the Sixth Amendment.[48]

We find this reasoning persuasive and consonant with Michigan case law, and therefore we adopt it here. Although the Michigan Supreme Court has not squarely addressed whether harmless error analysis may be applied in cases in which a defendant had the assistance of standby counsel, it has stated that "the presence of standby counsel does not legitimize a waiver-of-counsel inquiry that does not comport with legal standards."[49] Therefore, we conclude that Willing experienced a "total deprivation of counsel" despite the fact that he was assisted by standby counsel.

We further conclude that this total deprivation of counsel occurred during a critical stage of the proceedings. The phrase "critical stage" refers to "a step of a criminal proceeding, such as arraignment, that [holds] significant consequences for the accused."[50] In this case, Willing was left unrepresented at the combined *Walker* and entrapment hearings, which were his only opportunities to present his entrapment defense and to argue that his statement to the police should not be admitted.

---

[48] *Id.* at 312-313 (citation omitted; emphasis in original). See also *United States v Mateo*, 950 F2d 44, 48-50 (CA 1, 1991) (harmless error analysis inapplicable to ineffective waiver of right to counsel despite presence of standby counsel).

[49] *Dennany, supra* at 446 (opinion of GRIFFIN, J.)

[50] *Bell v Cone*, 535 US 685, 695-696; 122 S Ct 1843; 152 L Ed 2d 914 (2002).

Further, the hearings took place after Willing had been formally charged.[51] There is no doubt that the results of the rulings after the hearings affected the entire proceeding because, had Willing established that he was entrapped, he would have had a complete defense to the charge.[52] In sum, because Willing experienced a total deprivation of counsel during a critical stage, and because the effects of that deprivation pervaded the entire proceeding, his conviction must be reversed.

Reversed.

---

[51] See *Anderson (After Remand)*, *supra* at 402 (critical stages occur after the initiation of adversarial judicial proceedings against the accused).

[52] See *People v New*, 427 Mich 482, 490; 398 NW2d 358 (1986); *People v White*, 411 Mich 366, 393; 308 NW2d 128 (1981) (MOODY, J., concurring in part and dissenting in part).