# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DEVON LAMAR HAMPTON,

Defendant-Appellant.

UNPUBLISHED
September 20, 2018

No. 337431
Wayne Circuit Court
LC No. 16-008377-01-FC

Before: M. J. KELLY, P.J., and MARKEY and FORT HOOD, JJ.

PER CURIAM.

Defendant, Devon Hampton, appeals as of right his jury trial convictions of first-degree murder, MCL 750.316, carrying a concealed weapon, MCL 750.227, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Because there are no errors warranting relief, we affirm.

## I. BASIC FACTS

On September 2, 2016, Hampton shot and killed one of his coworkers, Jonathan Holmes, at their place of work, AJM Packaging. The shooting occurred around 11:30 p.m. Aaron Spratling testified that he had just clocked in and was making small talk with Hampton when Holmes walked up behind Hampton in an aggressive manner. Spratling recounted that Holmes stated, "Let me holler at you real quick," and Hampton responded, "I don't mess with you like that." Spratling headed toward his work station, but looked back when he was approximately 15 to 20 feet away. He testified that Hampton and Holmes were around five or six feet apart. Hampton was backing away from Holmes, who had a bag in his hand and kept saying, "No. Let me holler at you real quick. Let me holler at you." Another witness, Scott Zigler, testified that he observed Hampton and Holmes having an "unhappy" argument, but he could not make out anything other than "a couple of curing words back and forth between the two." Zigler and Spratling both testified that they saw Hampton shoot Holmes, who died from a single gunshot wound to the chest.

-1-

## II. SUBSTITUTION OF COUNSEL

### A. STANDARD OF REVIEW

Hampton first argues that the trial court abused its discretion when it denied his request for substitute counsel. A court's decision to deny a request for substitute counsel is reviewed for an abuse of discretion. *People v Strickland*, 293 Mich App 393, 397; 810 NW2d 660 (2011). An abuse of discretion occurs when the trial court's decision is outside the range of principled outcomes. *Id*.

### B. ANALYSIS

"Appointment of a substitute counsel is warranted only upon a showing of good cause and where substitution will not unreasonably disrupt the judicial process." *People v Mack*, 190 Mich App 7, 14; 475 NW2d 830 (1991). "Good cause exists where a legitimate difference of opinion develops between a defendant and his appointed counsel with regard to a fundamental trial tactic." *Id*. "The circumstances that would justify good cause rest on the individual facts in each case." *People v Buie*, 298 Mich App 50, 67; 825 NW2d 361 (2012). When a defendant asserts that his assigned lawyer "is not adequate or diligent, or is disinterested, the trial court should hear the defendant's claim and, if there is a factual dispute, take testimony and state its findings and conclusion on the record." *Strickland*, 293 Mich App at 397 (quotation marks and citation omitted).

In this case, Hampton requested substitute counsel on two occasions. First, before the preliminary examination, he sought a new lawyer because he had not seen his lawyer "in over a whole week and this is a serious case." The district court ascertained that Hampton had, however, met with his lawyer at the jail. Further, Hampton's lawyer noted that he had been appointed two weeks previously. He explained that since then he sought discovery from the prosecution, but was unable to acquire it until the probable cause conference. He stated that, even without it, he met with Hampton at the jail and had an extensive conversation about the case, during which time he advised Hampton about the delay with the discovery materials. The district court noted that if there was a legitimate reason why Hampton's lawyer could not represent him, it would listen to it. It then denied the request, noting that Hampton could raise it again in the circuit court.

Second, in October 2016, Hampton sent the circuit court a letter, requesting a new lawyer because he did not feel he was being "represented right." He added:

> My lawyer told me he would see me when I get back to the jail and haven't seen
> him since. I don't want to get railroaded. I don't want a lawyer that looks at me
> as just another person on the clock. I don't want a lawyer with bad reviews. And
> I will take your advice and write down the bible as soon as I get commissary.

Lawyer say [sic] he trying to help me but I never see him only 3 times. This is my freedom on the line.[1]

The trial court addressed Hampton's letter on October 17, 2016 at a pretrial hearing. Hampton explained that it was a serious case and he had not seen his lawyer in two weeks despite the fact that his lawyer stated he was "gonna see me in the jail." The court acknowledged that Hampton was worried, but asked whether "other than him not seeing you in two weeks, anything else?" Hampton responded, "No. I was just told I was gonna see him that day and I ain't see [sic] him," which was disappointing. The court asked Hampton's lawyer to "try harder to keep promises," so that Hampton could feel better. Hampton's lawyer, however, stated that although he did not "think that there's any basis upon which [Hampton] had a legitimate complaint," he thought the bond between them was broken because Hampton had twice complained about his representation. Hampton's lawyer stated that he was "fed up with it." The court noted that the request for a new lawyer was not based on performance, and denied Hampton's request.

On appeal, Hampton contends the court abused its discretion by denying his request for a new lawyer. First, he asserts that the court should have made further inquiries into the exact reasons that Hampton sought a new lawyer. Yet, the record reflects that the court asked Hampton whether there were additional reasons for requesting a new lawyer, and Hampton stated that there were not. The court was free to believe Hampton's response, and was not required to inquire further. Second, the fact that Hampton's request for a new lawyer came three months before trial and, therefore, would not disrupt the judicial process is irrelevant. Hampton sought a new lawyer because he was dissatisfied with the one he had, but he did not identify good cause for the substitution. Instead, each time Hampton sought the appointment of substitute counsel, he based it on the same reason: because his lawyer did not meet with him as often as Hampton wanted he did not feel his lawyer was representing him properly. Thus, based on our review of the record, there is nothing to support a finding that Hampton and his lawyer had "a legitimate difference of opinion . . . with regard to a fundamental trial tactic." See *Mack*, 190 Mich App at 14. Moreover, "[a] mere allegation that a defendant lacks confidence in his or her attorney, unsupported by a substantial reason, does not amount to adequate cause." *Strickland*, 293 Mich App at 398. "Likewise, a defendant's general unhappiness with counsel's representation is insufficient." *Id.* Therefore, the trial court did not abuse its discretion by denying Hampton's request for a new lawyer.

---

[1] Hampton's appellate lawyer has represented that the letter requesting a new lawyer was not included with the copy of the lower court record that he received. He stated that he specifically inquired about the letter and was advised that it was missing. Our review of the record, however, includes a handwritten letter from Hampton to the circuit court. The letter is post-dated October 7, 2016. Although we are concerned that Hampton's appellate lawyer was apparently not provided with a copy of this letter, we have nevertheless reviewed it thoroughly to ascertain whether it raises good cause for the appointment of substitute counsel or whether its contents required a more detailed inquiry from the trial court at the pretrial hearing.

Finally, Hampton argues that because he and his trial lawyer were "embroiled in irreconcilable conflict," he was completely deprived of the effective assistance of a lawyer. He contends that this is a structural defect that warrants reversal of his convictions without a showing of prejudice under *United States v Cronic*, 466 US 648; 104 S Ct 2039; 80 L Ed 2d 657 (1984). "It is well established that a total or complete deprivation of the right to counsel at a critical stage of a criminal proceeding is a structural error requiring automatic reversal." *People v Willing*, 267 Mich App 208, 224; 704 NW2d 472 (2005). Here, despite his problems with his lawyer, there is no indication that Hampton was completely deprived of the assistance of his lawyer during any critical stage of the criminal proceedings. Accordingly, we reject Hampton's claim of a structural error.

## III. SUFFICIENCY OF THE EVIDENCE

### A. STANDARD OF REVIEW

Hampton argues that there is insufficient evidence to support his first-degree murder conviction. "A challenge to the sufficiency of the evidence in a jury trial is reviewed de novo, viewing the evidence in the light most favorable to the prosecution, to determine whether the trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Gaines*, 306 Mich App 289, 296; 856 NW2d 222 (2014) (citation omitted). Because the standard of review is deferential "a reviewing court is *required* to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Oros*, ___ Mich ___, ____; ___ NW2d ___ (2018) (Docket No. 156241); slip op at 6.

### B. ANALYSIS

"The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). Hampton asserts that there is insufficient evidence of premeditation and deliberation. "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v Woods*, 416 Mich 581, 599 n 2; 331 NW2d 707 (1987) (quotation marks and citation omitted). "Premeditation and deliberation may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a 'second look.' " *Oros*, ___ Mich at ___; slip op at 9. There is no bright-line rule on what measure of time is "sufficient time for a reasonable person to subject his or her action to a second look." *Id*. at ___; slip op at 10 (quotation marks and citation omitted). But, "[i]t is often said that premeditation and deliberation require only a 'brief moment of thought' or a 'matter of seconds.' " *Id*., quoting LaFave, Substantive Criminal Law (3d ed), § 14.7(a), p 650 (alteration in original). "[T]he application of such principles may vary from case to case because the inquiry is highly dependent on the facts of each case," but in all cases "sufficient evidence must exist to support each element of first-degree premeditated murder." *Oros*, ___ Mich at ___; slip op at 17.

Here, less than a minute elapsed between when Holmes approached Hampton and when Hampton shot and killed Holmes. Using an aggressive tone, Holmes stated, "Let me holler at you real quick," and Hampton responded, "I don't mess with you like that." From this evidence the jury could rationally infer that the two men had a hostile prior relationship. See *People v*

*Schollaert*, 194 Mich App 158, 170; 486 NW2d 312 (1992) (stating that the parties prior relationship can be considered when determining whether premeditation has been established). Additionally, the record reflects that Hampton decided to bring a loaded and concealed firearm to his place of work. Although that fact, standing alone, is insufficient to establish premeditation, [2] it can be considered with the other evidence. Here, the parties did not remain stationary after Holmes initiated the argument. Instead, Hampton backed away, putting five to six feet of distance between them. Holmes continued to advance.

At some point, Hampton decided to go for his gun. The jury could infer that between the time Hampton reached for his gun, drew it from its place of concealment, and aimed it at Holmes that he formed homicidal intent. Further, between the time it took to form the initial homicidal intent and the time it took to act on it, Hampton had enough time to take a "second look" before ultimately aiming the gun at the center of Holmes's chest and pulling the trigger. It does not matter that only a matter of seconds may have elapsed, as "only a brief moment of thought or a matter of seconds" can constitute sufficient time. See *Oros*, ___ Mich at ___; slip op at 9 (quotation marks and citation omitted). Immediately after shooting Holmes, Hampton appeared like he was going to shoot him again. He did not do so. From this, the jury could infer that Hampton determined that his first shot had accomplished his objective and he did not need to shoot again.[3] In sum, there was sufficient evidence to support a finding of premeditation and deliberation.[4]

Hampton briefly contends that there is insufficient evidence to establish that the shooting was not justified. At trial, he asserted that he had been acting in self-defense. Self-defense is an affirmative defense. *People v Dupree*, 486 Mich 693, 707; 788 NW2d 399 (2010). "Once a defendant raises the issue of self-defense and 'satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exist,' the prosecution must 'exclude the possibility' of self-defense beyond a reasonable doubt." *People v Stevens*, 306 Mich App 620, 630; 858 NW2d 98 (2014), quoting Dupree, 486 Mich at 709-710. Self-defense generally requires (1) that the defendant had not or was not engaged in the commission of a crime at the time he used deadly force, (2) that the defendant was somewhere he had the legal right to be, and (3) that the defendant honestly and reasonably believed that the use of deadly force was necessary to prevent death or great bodily harm. See *People v Guajardo*, 300 Mich App 26, 35-36; 832 NW2d 409 (2013), citing

---

[2] See *People v Hoffmesiter*, 394 Mich 155, 160 n 6; 229 NW2d 305 (1975) (stating that the mere fact that a weapon was used to accomplish a murder is not evidence of premeditation and deliberation when a defendant carries the weapon as a matter of course).

[3] There was testimony that a witness to the shooting distracted Hampton, but the jury was not required to credit the witness's explanation for Hampton's actions.

[4] For the same reasons, there was also sufficient evidence for the jury to reject Hampton's alternative argument that he was only guilty of voluntary manslaughter because he had been acting out of "a temporary excitement induced by an adequate provocation." *People v Townes*, 391 Mich 578, 591; 218 NW2d 136 (1974).

MCL 780.972(1). In this case, a reasonable jury could have found that Hampton lacked an honest and reasonable belief that the use of deadly force was necessary. Although Holmes was bigger than Hampton, started a verbal argument, and was advancing toward him, the record reflects that there was five to six feet between the two men at the time that Hampton fired his gun. Further, there is no evidence that Hampton believed Holmes—who was unarmed—had a weapon or was in the process of reaching for a weapon. Additionally, Hampton's actions after the shooting—which included lying to a supervisor about his involvement, discarding his gun, and jumping in a pond to potentially obscure evidence—also suggest that at the time he shot Holmes he was not acting in self-defense. Thus, on this record, there was sufficient evidence for the jury to conclude that the elements of self-defense were disproved beyond a reasonable doubt.

## IV. PROSECUTORIAL MISCONDUCT

### A. STANDARD OF REVIEW

Hampton next asserts that his convictions should be reversed because the prosecutor committed misconduct during the trial. This Court reviews de novo issues of prosecutorial misconduct to determine whether the defendant was denied a fair and impartial trial. *Bennett*, 290 Mich App at 475. However, unpreserved prosecutorial misconduct claims are reviewed for plain error affecting the defendant's substantial rights. *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004). This requires the defendant to show that "the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Bennett*, 290 Mich App at 475-476 (quotation marks and citation omitted). Moreover, this Court "cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Id.* at 476.

### B. ANALYSIS

Hampton first contends that the prosecution committed misconduct during closing argument by repeatedly shifting the burden of proof by making the following arguments:

You're not allowed to have a concealed weapon in your workplace without a permit. *There's no evidence he had a permit.*

So, you heard from Danny Jones. The defendant told him he had a CPL. Well, that doesn't mean he had a CPL because he didn't. *There has been no evidence that he actually had a CPS, all right.* So, if you find he had the gun concealed, he's guilty of that crime of CCW.

\* \* \*

There is no reasonable doubt that Mr. Hampton shot Mr. Holmes. There is no reasonable doubt to that. *There's been no contradictory evidence whatsoever; same thing with the felonious assault, carrying concealed weapon felony firearm* [sic].

-6-

* * *

Now you can look at the facts objectively that have been testified to and know that they never got closer than five feet, didn't have a weapon this is uh well regulated area with security. It's not reasonable to assume he thought he was gonna die. *There has been zero, none, no evidence whatsoever that he thought he was uh anything bad was gonna happen to him.* Amazing he didn't get closer than five feet. It was—the idea that you're gonna infer his thoughts about death, it's just ridiculous. *There is no evidence whatsoever that he acted in lawful self-defense, none it's not even close.* There—it's just—no one testified to anything that justifies deadly force in this case, not at all.

* * *

So the last thing I wanna say is, [Hampton's lawyer] says the defendant was in fear. *There is like literally no evidence of that none, zero.* Nobody told you the defendant was in fear; nobody told you the defendant is excited um you know screaming, was attack; that the man got any closer than five feet to him. No, there is zero evidence that he was in fear, none whatsoever.

"A prosecutor may not imply in closing argument that the defendant must prove something or present a reasonable explanation for damaging evidence because such an argument tends to shift the burden of proof." *People v Fyda*, 288 Mich App 446, 463-464; 793 NW2d 712 (2010).

Here, although the prosecutor stated that there was no evidence supporting Hampton's defense and that the evidence supporting the charges was, essentially uncontradicted, we conclude that the arguments did not impermissibly shift the burden to Hampton to demonstrate his innocence. "[A] prosecutor's argument that inculpatory evidence is undisputed does not constitute improper comment." *Id*. at 464. Further, a prosecutor "may also argue that the evidence was uncontradicted even if the defendant is the only person who could have contradicted the evidence." *Id*. Because Hampton raised a claim of self-defense, the prosecutor was free to comment on the weakness of that defense, including the lack of evidence supporting it. Moreover, the record reflects that the court instructed the jury after closing arguments that the burden of proof was on the prosecution to prove each element beyond a reasonable doubt and that Hampton was not required to prove his innocence or do anything. It is presumed that the jury followed those instructions. *Id*. at 465. Thus, even if some of the comments may have improperly shifted the burden, Hampton cannot establish that he was prejudiced by the error given the instructions provided to the jury.

Hampton also argues that the prosecutor committed misconduct during rebuttal argument by making the following argument:

The defendant goes ahead and jumps in a pond to destroy evidence um destroys his cell phones which would contain who knows what. His clothes get soaking wet, covered in mud um I guess prior to destroying his cell phones, he supposedly called the police; and no one has even testified that it's his voice. But the Defense thinks that's his voice so that's an admitted exhibit. You can consider that.

Hampton believes this argument is improper because the prosecution, not the defense sought to admit the 9-1-1 call and solicited testimony from a police officer that Hampton was the one who made the call. We disagree. There was testimony that someone used Hampton's cellular phone to call 9-1-1, but no one positively identified the voice on the recording as Hampton's voice, so the prosecutor's argument did not, in fact, misstate the evidence. Additionally, although the prosecutor solicited the testimony about the 9-1-1 call, in his closing argument Hampton's lawyer asserted that Hampton had made the call and reported the shooting. Accordingly, the prosecutor's argument was a fair response to the defense argument, regardless of the fact that the prosecutor originally sought testimony that Hampton had made the phone call.

Next, in a Standard 4 brief, Hampton argues that the prosecutor improperly appealed to the juror's fears by stating that Hampton shot Holmes "right in the middle. He's a good shot, it's entirely dead center." Hampton does not explain, however, how that comment appealed to the juror's fears, and we see nothing improper about it. Hampton also takes issue with the prosecutor's argument that Hampton was guilty because he fled the crime and attempted to conceal it by jumping in a pond. Those comments were proper, however, as they were responsive to the evidence and did not contain a misstatement of law. See *People v Unger*, 278 Mich App 210, 226; 749 NW2d 272 (2008) (evidence of flight can indicate a consciousness of guilt).

Hampton next asserts that the prosecutor committed misconduct by stating, "So, um there is a Bible verse that I always screw up but, basically, a guilty plea um will [sic] the righteous stand like lions." We are unclear as to how this statement was designed to appeal to the passions of the jurors. Yet, in context, it is plain that the prosecutor was arguing that the jury should reject the self-defense argument because, rather than immediately stating that he had shot in self-defense, Hampton lied to his supervisor and attempted to hide his involvement in the crime by jumping in a pond and discarding his gun. Because it was responsive to the evidence and arguments, the statement was not improper.

Hampton additionally believes that the prosecutor committed misconduct when questioning Prentis Davis. Davis's testimony was extremely brief. He stated that he was Holmes's mother's fiancé and that he viewed Holmes's body at the hospital. The prosecutor also asked Davis what had happened to Holmes's mother, and he was informed that she had died from a massive heart attack less than a week earlier. Hampton contends that the information about the heart attack was improper; however, in context, it is clear that the prosecutor was merely obtaining background information and expressing sympathies to the witness. Although not relevant to the charges against Hampton, the isolated remark about Holmes's mother's death did not affect Hampton's substantial rights.

Next, Hampton asserts that the prosecutor elicited misleading testimony that suggested he had tried to conceal the evidence by jumping in a pond. However, given that there was evidence that he was soaking wet when arrested, that his phones did not work because of water damage, and that he discarded the murder weapon, the jury could infer that Hampton was attempting to conceal evidence even without testimony from a witness that mud on clothes could hide evidence.

Additionally, Hampton argues that testimony from an expert witness was improper because it "pushed the burden of guilt" toward him. The witness testified that Holmes's DNA was not found on a pair of glasses, the gun's trigger, the gun's grip, and Hampton's jeans. This evidence, contrary to Hampton's argument, is actually favorable to him as it suggests that there was no evidence on his person that needed to be concealed by jumping in a pond.

Hampton next suggests that the prosecutor committed misconduct by eliciting statements from a police detective during the due diligence hearing. Specifically, the detective testified that he was told that Jasmine Gonzales-Sims was avoiding her subpoena because she was afraid of retaliation by Hampton and his family. However, the allegedly prejudicial statements were made outside the presence of the jury, so they did not affect the outcome of the trial.

Finally, Hampton suggests that Zigler and Jones's testimony was perjured. In support, he directs this Court to testimony from a police officer that when he arrived on the scene no one was providing aid to Holmes, but Zigler and Jones testified that Zigler was providing aid to Holmes after the shooting. Yet, the officer testified that there were a number of rags near Holmes that appeared to have been used to compress the gunshot wounds, which suggests that someone had actually provided aid to Holmes before the police officer arrived. Moreover, resolving inconsistencies between witnesses is a matter squarely within the purview of the jury. See *People v Stevens*, 306 Mich App at 628.

Therefore, on the record before this Court, the prosecutor did not commit misconduct warranting reversal of his convictions.[5]

---

[5] Hampton alternatively asserts that his trial lawyer provided ineffective assistance by failing to object to the prosecutorial misconduct. However, as there is no evidence of prosecutorial misconduct, Hampton's lawyer was not ineffective for failing to object to it. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) (stating that a lawyer's failure to raise a meritless objection does not constitute ineffective assistance of counsel). Additionally, even if some of the comments were improper and warranted an objection, Hampton cannot establish that his lawyer's failure to object was outcome determinative. See *People v Solloway*, 316 Mich App 174, 191; 891 NW2d 255 (2016). The jury was properly instructed that the prosecution bore the burden of proof and that Hampton was presumed innocent and did not have to prove anything.

Hampton also contends that his lawyer was ineffective when he made comments during closing argument suggesting that the prosecutor could draw a direct line between Hampton and the gun and suggesting that it was not a good idea to bring a gun to work. Yet, there was evidence that the gun was registered to Hampton, and it is undisputed that he brought it to work with him. It is likely that Hampton's lawyer conceded those points in order to focus on the parts of the evidence that were, in fact, arguable, such as whether Zigler's testimony was credible and whether there was evidence supporting self-defense. The fact that the strategy was not wholly effective does not constitute ineffective assistance. *People v Williams*, 240 Mich App 316, 332; 614 NW2d 647 (2000).

## V.  JURY INSTRUCTIONS

## A.  STANDARD OF REVIEW

Hampton finally asserts that the trial court erred by not giving the jury the missing-witness instruction. "We review a trial court's determination of due diligence and the appropriateness of a 'missing witness' instruction for an abuse of discretion." *People v Eccles*, 260 Mich App 379, 389; 677 NW2d 76 (2004).

## B.  ANALYSIS

MCL 767.40a(3) requires the prosecution to send to the "defendant or his or her attorney a list of the witnesses the prosecuting attorney intends to produce at trial." "A prosecutor who endorses a witness under MCL 767.40a(3) is obliged to exercise due diligence to produce that witness at trial." *Eccles*, 260 Mich App at 388. "A prosecutor who fails to produce an endorsed witness may show that the witness could not be produced despite the exercise of due diligence." *Id*. "If the trial court finds a lack of due diligence, the jury should be instructed that it may infer that the missing witness's testimony would have been unfavorable to the prosecution's case." *Id*. at 388-389. Due diligence is shown by the prosecution's "attempt to do everything reasonable, not everything possible, to obtain the presence of a witness." *Id*. at 391.

In this case a due diligence hearing was held with regard to the police efforts to locate Gonzales-Sims. At the hearing a police detective testified that he attempted to secure her presence. He stated that on numerous occasions he called the number that Gonzales-Sims had provided, but it always went to voicemail. He left messages, but received no return calls. The detective also contacted Gonzales-Sims's mother, who told him that she did not have contact with Gonzales-Sims. The detective stated that Gonzales-Sims's mother stated that she would try and contact her daughter through Facebook, and he stated that he also attempted to do so without success. The record reflects that the detective waited a few days and contacted Gonzales-Sims's mother again. He also went to her address, but was advised that Gonzales-Sims did not live there. He checked to see if Gonzales-Sims had a vehicle registered at any address, but she did not. Approximately four or five times, the detective conducted surveillance at Gonzales-Sims's mother's house, but he did not see her.

The detective further testified that he found the address of an apartment complex associated with Gonzales-Sims in Southgate, Michigan, but he did not see her there when he visited the complex. The detective stated that Gonzales-Sims's mother told him that Gonzales-Sims was on the east side of Detroit and was receiving state assistance. He "went through the state fugitive resources," and "had them do a work up on [Gonzales-Sims] to see if there [were] any other addresses [associated with Gonzales-Sims] that they could find." When the state got back to him, however, the only address they provided him was the house where Gonzales-Sims's mother lived. The detective stated that he also entered Gonzales-Sims's telephone number into Facebook, leading him to her Facebook profile. Additionally, "her alleged current boyfriend's Facebook came up," and the detective discovered that the alleged current boyfriend's address was for Gonzales-Sim's mother's house.

Finally, the detective also contacted Gonzales-Sims's employer and learned that she was no longer working there. He contacted human resources at the temporary employment agency Gonzales-Sims had previously used, but was told that she was no longer there either. Gonzales-Sims's mother additionally told the detective that her daughter was going to trade school, but stated that she did not know anything more about it. When the detective explained the seriousness of the case, Gonzales-Sims's mother stated that her daughter was "afraid of retaliation by the suspect and his family." The detective informed Gonzales-Sims's mother that the police would escort Gonzales-Sims and that security was not a problem, but he did not know if she conveyed that message to Gonzales-Sims.

The trial court found that the efforts to find Gonzales-Sims had been going on for over a month, which it felt was a reasonable timeframe. The court also found it important that the detective checked numerous resources, but was unable to successfully locate Gonzales-Sims. In light of the extensive efforts made to locate Gonzales-Sims, the court did not abuse its discretion by not giving a missing-witness instruction to the jury.

Affirmed.

/s/ Michael J. Kelly
/s/ Jane E. Markey
/s/ Karen M. Fort Hood