*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
October 28, 2021

v

No. 350192
Washtenaw Circuit Court
LC No. 18-000908-FH

ISAIAH LEON RAMSEUR,

Defendant-Appellant.

Before: SHAPIRO, P.J., and BORRELLO and O'BRIEN, JJ.

PER CURIAM.

A jury convicted defendant of interfering with a crime report, MCL 750.483a(2)(b); interfering with electronic communications, MCL 750.540(5)(a); witness intimidation, MCL 750.122(7)(a); and two counts of domestic violence, third offense, MCL 750.81(2).[1] The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 6 to 15 years' imprisonment for each charge, to be served consecutively to defendant's "parole case" and concurrently to each other. Defendant now appeals as of right. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This case arises from a domestic relationship between the victim and defendant. According to the victim's testimony at trial, she and defendant met at work in January 2018 and began a romantic relationship. The victim testified that on her first date with defendant, she told defendant that she was married, that her husband was in Saudi Arabia, that she was from Saudi Arabia, and that she had HIV. The victim further testified that defendant did not indicate that the victim's HIV was an issue, and they continued their relationship. Approximately two weeks later, defendant convinced the victim to let him move into her Michigan apartment. The victim's husband was still in Saudi Arabia.

---

[1] The jury also acquitted defendant of one count of domestic violence, third offense.

In the first week of February, the victim told defendant that she wanted to end the relationship and wanted him to move out. Defendant allegedly told her that if she asked him to end the relationship or leave the apartment, he would "hurt" her or "do something bad" to her. The victim testified that she did not end the relationship at that time because defendant threatened to tell her parents, friends, and husband about their affair.

Over the next few weeks, defendant subjected the victim to multiple acts of physical and emotional abuse. According to the victim, defendant once used verbal abuse to force her to pull her pants down and bend over, and defendant then hit her bare buttocks with a belt. During that incident, the victim and defendant had been arguing about ending the relationship and defendant moving out of the apartment. The victim testified as follows on direct examination by the prosecutor:

> *Q*. Okay. And did you call the police after the belt incident?
>
> *A*. No, I—I—I couldn't, I was scared because he threatened me multiple of times if I call the police or ask anyone for help he would hurt me or kill me or will hurt everyone I know with his connections if he went to jail. So he was just hurting me to do—to hurt me.

The victim described another time when they were arguing about ending the relationship and defendant grabbed her phone, starting typing a text message, and said that he was going to reveal their relationship to her parents and family. Defendant ran out of the apartment with her phone, and she followed him. As she was trying to get her phone, defendant pushed her onto the floor in the corridor. When she continued to chase him, she twisted her ankle on the stairs. As she was crying and begging him not to tell anyone, he said, "Oh, I'm not going to text them, I was just only threatening you."

The victim testified that on February 13, 2018, she and defendant were arguing again and defendant hit her, hurt her, forced her to remove her clothes, used her phone to take a picture of her naked body, and then began typing a text message to send to her friends and family, along with the picture. The victim said that she saw defendant typing and tried to take the phone from him. In the end, he "changed his mind and didn't text, but he was attempting." The victim stated further that defendant hit her three times in the face, choked her, and left injuries to her chin, her mouth, and under her eye. The victim also testified that defendant drove her to Ohio on February 13, and that he told her he was going to sell her as a "sex slave." The next day, Valentine's Day, defendant used the victim's debit card to have flowers sent to the victim at work.

The victim and defendant had another argument on March 3, 2018. The victim described the incident:

> I was telling him that my husband's coming, and I want him to get out of my apartment. I don't want anything related to him whatsoever. And of course he got angry. He didn't want that to happen, and we got into the—an argument where he cornered me in the living room. He just kept approaching me when he was talking, and then cornered me into the living room, and then he put his hands over my throat. And then I told him I will call the police—I will call police, just remove

your hand. I will call the police. I was just looking at him just—just please stop, and then he removed his hand.

* * *

So I wanted to—to ask for help and just get out from this situation I was in. I needed help. I was done. I'm just tired from this. So, I tried—I took a knife. I tried to cut the screen of back of me from my apartment just to escape, and go ask for help. Unfortunately, I couldn't. I just slipped and fell over, and I couldn't—I just couldn't get out of my apartment and jump from the balcony. So, and he was trying to prevent me to go out, but I—I made it through, and I just ran, took my phone, took my key, and run out of the apartment to my car, and everything—the knife was still with me. I'm just so scared. And then he followed me to the car, and he told me in the car, literally, he said, "Do you think that I will let you call the police and tell them about everything; do you really think that I will let you do that?" And then I was heading to the police station. I just want—I was barefoot. It was too cold. I just wanted help. And then he—he start apologizing and crying, and we're going not do this anymore. I'm sorry and all of these things. So I said, okay, fine, I don't want to get more problems because he already threatened me before if I call the police he would hurt me, so I just, okay, fine. It's—it's fine, let's go back to the apartment. So we went back to the apartment, and—

After returning to the apartment, the victim told defendant that she wanted to end the relationship and that he needed to be out of the apartment by 5:00 a.m. on March 4. Defendant went to the casino on the night of March 3 and did not return until 9:00 on the morning of March 4. At that time, he told the victim that he was not going to move out until she rented an apartment for him in her name. The plan was for the victim to take two paycheck stubs to a cash advance store and get money to rent the apartment.

The victim and defendant got into the victim's car. As defendant was driving to the cash advance store, an argument broke out. The victim said that defendant became angry and started driving very fast. As defendant slowed down to turn left, the victim opened the door, removed her seatbelt, and jumped out of the car; she hurt her left leg and foot. The victim testified that she had tried to grab her phone before jumping out of the car, but defendant had prevented her from getting it by pushing her. She knocked on a couple of doors in the surrounding neighborhood before finding someone who let her use his phone to call the police. The victim testified that defendant came up to her and saw her calling 911. Defendant still had the victim's phone.

The police arrived and returned the victim's phone after first talking to defendant. The victim discovered at this point that while she was calling 911, defendant had attempted to send a text message to all of the victim's contacts that included the nude picture of the victim that defendant had previously taken. However, the victim testified that her phone's "data was off, and nothing was sent."

Defendant, who represented himself through this case, told a very different story during his narrative testimony. Essentially, defendant claimed that he and the victim had a strong, romantic relationship until he discovered that she had HIV, which he alleged was not something

-3-

she had disclosed to him in the beginning of their relationship as she had testified. Defendant testified that he was the one who tried to end the relationship and that the victim did not want him to leave her. With respect to the incident where the victim jumped out of the car, defendant testified that the victim pulled the keys out of the ignition as he was driving and jumped out of the car because she was upset that he was not going to move into a new apartment with her. Defendant also testified that the victim had hit him and lost her temper in the car before pulling the keys out of the ignition. Defendant admitted to trying to send the text message and nude picture from the victim's phone while she was calling the police, although he seemed to claim that he only tried to send it to the victim's father. Defendant denied assaulting the victim, explaining away various allegations as the result of their sexual activity or accident.

Defendant was charged and convicted as already indicated. The trial court denied defendant's posttrial motion for a new trial. This appeal followed.

## II. WAIVER OF COUNSEL

On appeal, defendant first argues that the lower court failed to follow the basic requirements for eliciting a waiver of counsel and that his waiver of counsel was therefore not knowing or intelligent. Defendant maintains that this was a structural error that entitles him to a new trial.

## A. STANDARD OF REVIEW AND ISSUE PRESERVATION

Whether a defendant's waiver of the right to counsel was knowing, intelligent, and voluntary is a question of law that this Court reviews de novo, but we review the trial court's underlying factual findings for clear error. *People v Williams*, 470 Mich 634, 640; 683 NW2d 597 (2004).

However, when defendant asserted his right to represent himself and waived the assistance of counsel at his May 3, 2018 arraignment, defendant did not raise any challenge to the validity of his waiver of counsel or otherwise assert that his decision to represent himself and his concurrent waiver of counsel was not knowingly, intelligently, and voluntarily made. Rather, defendant affirmatively and clearly expressed his desire to represent himself and to not have counsel appointed to represent him, although he also expressed that he would accept the appointment of standby counsel. Furthermore, defendant does not claim on appeal to have raised at any point in the proceedings below any such challenges to the trial court's procedures with respect to permitting defendant to waive the right to the assistance of counsel and honoring defendant's desire to represent himself.

A claim of error is unpreserved for appeal if it was not properly and timely raised before the lower court. *People v Cain*, 498 Mich 108, 114-115; 869 NW2d 829 (2015). Unpreserved claims of error, including claims of structural constitutional error, are reviewed under the "plain error" standard. *Id*. at 115-116.

> To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court

proceedings. It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice. Finally, once a defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999) (quotation marks and citations omitted; alteration in original).]

In this case, defendant nonetheless asserts (1) that "[n]o objection is required to preserve the issue of denial of counsel for review," citing *Hunt v Mitchell*, 261 F3d 575, 582 (CA 6, 2001), and (2) that the United States Supreme Court found "a reversible denial of the right to counsel where defendant did not object" in *Powell v Alabama*, 287 US 45, 57-58; 53 S Ct 55; 77 L Ed 158 (1932).

We acknowledge that a claim alleging the complete deprivation of counsel at a critical stage of a criminal proceeding implicates a claim of constitutional error that is considered structural and does not require a showing of prejudice. See, e.g., *United States v Cronic*, 466 US 648, 659 & n 25; 104 S Ct 2039; 80 L Ed 2d 657 (1984); *People v Russell*, 471 Mich 182, 194 n 29; 684 NW2d 745 (2004). Yet, the United States Supreme Court has more recently explained, "This Court has several times declined to resolve whether 'structural' errors—those that affect 'the framework within which the trial proceeds,'—automatically satisfy the third prong of the plain-error test." *Puckett v United States*, 556 US 129, 140; 129 S Ct 1423; 173 L Ed 2d 266 (2009) (citation omitted). Thus, the United States Supreme Court has recognized that the plain-error test and, by extension, the normal preservation requirements apply to structural errors. *Id.*; see also *id.* at 134 ("No procedural principle is more familiar to this Court than that a . . . right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.") (quotation marks and citation omitted; ellipsis in original). Our Supreme Court has also held that even when a defendant asserts a claim of error that is "among the limited class of constitutional violations that are structural in nature, a defendant is still not entitled to relief unless he or she can satisfy the four requirements set forth in *Carines*." *Cain*, 498 Mich at 116 (quotation marks and citation omitted).

We note that the above statements by the United States Supreme Court and Michigan Supreme Court concern the standard of review to apply in determining whether relief is warranted, based on whether the claim of error was properly preserved. We also note that at issue in this case is the tension between two important constitutional rights: the right to counsel and the right to self-representation. See *Faretta v California*, 422 US 806, 832; 95 S Ct 2525; 45 L Ed 2d 562 (1975) ("There can be no blinking the fact that the right of an accused to conduct his own defense seems to cut against the grain of this Court's decisions holding that the Constitution requires that no accused can be convicted and imprisoned unless he has been accorded the right to the assistance of counsel."). Clearly, a defendant cannot exercise both rights simultaneously. See *id.* at 835 ("When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must knowingly and intelligently forgo those relinquished benefits.") (quotation marks and citation omitted).

The circumstances of this case, involving defendant's choice of his right to self-representation over his right to counsel are thus markedly distinguishable from the factual circumstances in *Hunt* and *Powell* where there was no attempt to assert the right to self-representation. See *Hunt*, 261 F3d at 578-579, 581-584; *Powell*, 287 US at 49-50, 52-54, 56-58.

Accordingly, based on United States Supreme Court and Michigan Supreme Court precedent, we conclude that defendant's claim of error in this case regarding his waiver of the right to counsel in asserting his right to self-representation is unpreserved and that, consequently, he must satisfy the plain-error test to be entitled to relief on appeal. *Puckett*, 556 US at 140; *Cain*, 498 Mich at 116.

## B. ANALYSIS

As this Court explained in *People v Willing*, 267 Mich App 208, 219; 704 NW2d 472 (2005),

> Before granting a defendant's request to represent himself or herself, the trial court must determine that the three factors set forth in *People v Anderson* [398 Mich 361, 367-368; 247 NW2d 857 (1976)] have been met: (1) the defendant's request is unequivocal, (2) the defendant is asserting the right knowingly, intelligently, and voluntarily after being informed of the dangers and disadvantages of self-representation, and (3) the defendant's self-representation will not disrupt, unduly inconvenience, and burden the court and the administration of the court's business.

The trial court must also satisfy the requirements in MCR 6.005(D). *Willing*, 267 Mich App at 219-220. MCR 6.005(D) provides in relevant part as follows:

> The court may not permit the defendant to make an initial waiver of the right to be represented by a lawyer without first

> (1) advising the defendant of the charge, the maximum possible prison sentence for the offense, any mandatory minimum sentence required by law, and the risk involved in self-representation, and

> (2) offering the defendant the opportunity to consult with a retained lawyer or, if the defendant is indigent, the opportunity to consult with an appointed lawyer.

"A trial court must substantially comply with the *Anderson* factors and the court rule for a defendant to effect a valid waiver of the right to counsel." *Willing*, 267 Mich App at 220. In *Russell*, 471 Mich at 191, our Supreme Court explained the concept of "substantial compliance" as follows:

> We hold, therefore, that trial courts must substantially comply with the aforementioned substantive requirements set forth in both *Anderson* and MCR 6.005(D). Substantial compliance requires that the court discuss the substance of both *Anderson* and MCR 6.005(D) in a short colloquy with the defendant, and make an express finding that the defendant fully understands, recognizes, and agrees to

-6-

abide by the waiver of counsel procedures. The nonformalistic nature of a substantial compliance rule affords the protection of a strict compliance rule with far less of the problems associated with requiring courts to engage in a word-for-word litany approach. Further, we believe this standard protects the vital constitutional rights involved while avoiding the unjustified manipulation which can otherwise throw a real but unnecessary burden on the criminal justice system. [Quotation marks and citation omitted.]

At defendant's arraignment in this case, the district court informed defendant of the felony charges against him, the maximum penalty for each charge, and the possibilities of consecutive sentencing. The district court then proceeded to explain defendant's rights. As the court was explaining to defendant that he was entitled to have an attorney appointed to represent him if he could not afford to hire an attorney, defendant announced, "I'm still going to represent myself." The court responded that it would still appoint counsel so that defendant could consult with and ask questions of an attorney even if defendant continued to choose to represent himself. The following discussion occurred:

> THE DEFENDANT: If I have a lawyer on file, then they would not allow me into the law library to actually research any of the cases or anything like that. So if it's appointed as a side counsel like it's been, then that, won't stop me from being able to stay in the case, but if you appoint me a counsel or attorney for that case, then when I go through to actually study my case they won't allow it. They will not allow me access to study the law at the law library in the jail if I have legal representation. So I am absolutely refusing anything more than a side counsel.

> THE COURT: All right. And I'm required to tell you you may be at a disadvantage, Mr. Ramseur, because the other side is represented by an attorney.

> THE DEFENDANT: Uh-huh.

> THE COURT: And in this case I really think you should have an attorney to represent you. These are serious charges for which you could go to prison. We're not talking misdemeanors anymore. Do you understand that?

> THE DEFENDANT: I fully understand that they have escalated the threat, but it's the same threat. It's not a problem. I'm going back to prison if I was found guilty on the misdemeanors.

> THE COURT: All right. So what I'm going to do is for right now appointment [sic] the Public Defender as standby counsel.

> THE DEFENDANT: Uh-huh.

> THE COURT: And at the next hearing if you choose to have them represent you, you can, but if, on the jail disposition if you can indicate the Defendant is representing himself, that way there won't be an issue with the law library hopefully.

At the conclusion of the arraignment hearing, the district court noted that defendant had waived counsel and elected to represent himself.

The foregoing demonstrates that defendant made an unequivocal request to represent himself, satisfying the first *Anderson* requirement. However, turning to the second *Anderson* requirement, the district court merely told defendant that he would be at a disadvantage representing himself because the prosecutor was an attorney and that the court believed defendant should be represented by an attorney because the charges were serious. The district court did not engage defendant in *any* discussion about what the potential disadvantages and risks actually were. As our Supreme Court explained in *Anderson*:

> [O]nce the defendant has unequivocally declared his desire to proceed Pro se the trial court must determine whether defendant is asserting his right knowingly, intelligently and voluntarily. The trial court must make the Pro se defendant aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open. [*Anderson*, 398 Mich at 368 (citations omitted).]

Here, the district court clearly failed to make a record to establish that defendant knew what he was doing and made his choice with "eyes open." Instead, the district court merely stated its conclusion that there is a disadvantage in self-representation without providing any examples (such as a lack of familiarity with the rules of evidence, procedural rules, and substantive legal concepts with which the prosecutor would be familiar through training and experience).[2] Thus, the district

---

[2] For example, a trial court may make the defendant aware of the attendant risks by advising the defendant of the following, or similar, concepts:

> (a) That self-representation is almost always unwise and that he may conduct a defense "ultimately to his own detriment."

> (b) That he is entitled to and will receive no special indulgence by the court, and that he must follow all the technical rules of substantive law, criminal procedure and evidence in the making of motions and objections, the presentation of evidence, voir dire and argument. It should be made crystal clear that the same rules that govern an attorney will govern, control and restrict him—and that he will get no help from the judge. He will have to abide by the same rules that it took years for a lawyer to learn.

> (c) That the prosecution will be represented by an experienced professional counsel who, in turn, will give him no quarter because he does not happen to have the same skills and experience as the professional. In other words, from the standpoint of professional skill, training, education, experience, and ability, it will definitely not be a fair fight . . . .

> (d) That he is going to receive no more library privileges than those available to any other pro per, that he will receive no extra time for preparation and that he will

court did not create a record showing that defendant had been made "aware" of the potential dangers and disadvantages of self-representation. *Id*. The district court also failed to make the requisite findings on the record to indicate that defendant understood the choice he was making was effectuating a knowing, intelligent, and voluntary waiver. *Russell*, 471 Mich at 191; *Willing*, 267 Mich App at 219-220.

We recognize that substantial, rather than strict, compliance is the standard for reviewing the adequacy of the lower court's waiver procedures, but we conclude that the district court's almost complete lack of any meaningful discussion regarding the dangers and risks of self-representation fell below the standard of substantial compliance with the requirements of *Anderson* and the court rule. This was error, and it was plain—especially considering the well-established procedure our Supreme Court has set forth for courts to follow when a defendant expresses a desire to exercise the right of self-representation and that these standards have been in effect for decades. The district court in this case failed to substantially comply with this procedure, thereby committing plain error with respect to defendant's waiver of counsel.

Turning to the prejudice prong of the plain-error test, our Supreme Court has indicated that an unpreserved claim of plain structural error is sufficient in itself to satisfy the prejudice prong. *People v Vaughn*, 491 Mich 642, 666; 821 NW2d 288 (2012).

However, even if the first three prongs of the plain-error standard have been met, we still must exercise our discretion under the fourth *Carines* prong to determine whether reversal is justified. *Carines*, 460 Mich at 763. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (quotation marks and citation omitted; alteration in original).

In this case, defendant was repeatedly adamant that he wanted to represent himself. He also displayed a degree of sophistication and knowledge with respect to his discussion of his access to the law library for purposes of researching matters related to his case. The district court, although failing to provide much of an explanation of its reasoning, nonetheless did manage to explain to defendant that he would be better off if represented by an attorney. Defendant rejected that advice. The district court also fully informed defendant of the charges he faced, their serious nature, and the maximum penalties applicable to each. Although defendant was eventually subjected to higher maximum penalties as a result of being a fourth offense habitual offender, the prosecution had not yet filed the habitual offender notice at the time of defendant's arraignment at which he made his initial waiver of counsel. Thus, we cannot fault the district court for only referring to the statutory maximums for each charge without any habitual offender enhancement; the district court's advice in this regard was factually accurate at the time it was given. Defendant also had the availability of standby counsel, whom defendant chose to consult multiple times

---

have no staff of investigators at his beck and call. [*People v Blunt*, 189 Mich App 643, 649-650; 473 NW2d 792 (1991) (citations omitted; ellipsis in original).]

during the trial. Defendant consistently reaffirmed his desire to represent himself throughout his trial.

Under these circumstances, we do not find that the error in the district court's waiver procedure seriously affected the fairness, integrity or public reputation of judicial proceedings. Defendant does not advance any argument that reversal is required on the basis of the erroneous waiver because he is actually innocent, nor does our review of the record convince us that defendant is actually innocent. Thus, although defendant has shown plain error, reversal is not warranted in this case. *Id*.

In reaching this conclusion, we are guided by the following statement from the United States Supreme Court:

> It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to believe that the law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of that respect for the individual which is the lifeblood of the law. [*Faretta*, 422 US at 834 (quotation marks and citation omitted).]

Next, defendant argues that the trial court failed to comply with MCR 6.005(E) by not reaffirming his waiver of counsel at the beginning of his sentencing hearing. MCR 6.005(E) provides:

> If a defendant has waived the assistance of a lawyer, the record of each subsequent proceeding (e.g., preliminary examination, arraignment, proceedings leading to possible revocation of youthful trainee status, hearings, trial or sentencing) need show only that the court advised the defendant of the continuing right to a lawyer's assistance (at public expense if the defendant is indigent) and that the defendant waived that right. Before the court begins such proceedings,
>
> > (1) the defendant must reaffirm that a lawyer's assistance is not wanted; or
> >
> > (2) if the defendant requests a lawyer and is financially unable to retain one, the court must appoint one; or
> >
> > (3) if the defendant wants to retain a lawyer and has the financial ability to do so, the court must allow the defendant a reasonable opportunity to retain one.

The court may refuse to adjourn a proceeding to appoint counsel or allow a defendant to retain counsel if an adjournment would significantly prejudice the prosecution, and the defendant has not been reasonably diligent in seeking counsel.

Our Supreme Court has held that unlike the initial waiver of counsel discussed above, the failure to comply with MCR 6.005(E) is not of constitutional dimension and is "to be treated as any other trial error." *People v Lane*, 453 Mich 132, 139-140; 551 NW2d 382 (1996). In this case, defendant's sentencing hearing began with his motion for a new trial. The trial court engaged defendant on the record at the beginning of the hearing as follows:

THE COURT: I have your motion, and I know that you have standby counsel present with you. Which of you is going to argue the motion?

DEFENDANT: I will be.

Defendant then proceeded to argue his motion.

Although this brief interaction seems to imply that defendant had a continuing right to the assistance of counsel and that he wished to maintain his waiver and continue representing himself, it nonetheless fell well short of complying with the basic requirements of MCR 6.005(E), which we note are few and far from burdensome. However, this claim of error is unpreserved since there was no objection, and our review is for plain error. *Cain*, 498 Mich 108, 114-116. The trial court's failure to comply with MCR 6.005(E) constituted plain error. Since this is to be treated as an ordinary trial error rather than a structural error, prejudice is not presumed. *Lane*, 453 Mich at 139-140. Here, defendant has not shown how he was prejudiced by this error, considering that he continued to assert his desire and right to represent himself at the sentencing hearing.[3] Thus, reversal is not required. *Carines*, 460 Mich at 763.

Finally, defendant contends that he did not knowingly waive his right to counsel because the trial court never informed him that, if convicted of certain of the charges against him, the maximum possible sentence that he faced, with habitual-offender enhancement, was life in prison. It is true that the trial court never verbally informed defendant on the record of the maximum possible penalties that he faced with habitual-offender enhancements after the prosecution filed the habitual offender notice. However, as discussed in more detail below in the context of defendant's sentencing issue, the record indicates that defendant received a written habitual-offender notice, after which he continued to reaffirm his desire to represent himself.

Defendant has not cited any legal authority for the proposition that the trial court must verbally inform defendant on the record of an enhancement to his maximum potential penalty based on a habitual-offender notice, and essentially obtain a new waiver of counsel, when the habitual-offender notice is filed after the defendant has already waived the right to counsel and asserted the right to self-representation. Therefore, this argument is abandoned. "An appellant

---

[3] We also note that defendant had consistently made his desire to represent himself clear at previous proceedings, including each day of trial, and he had been informed of his continuing right to counsel during trial.

-11-

may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Head*, 323 Mich App 526, 546; 917 NW2d 752 (2018) (quotation marks and citation omitted).

## III.  *BRADY* VIOLATIONS

Defendant next argues that he is entitled to a new trial because the prosecution suppressed exculpatory evidence in violation of *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 216 (1963).

## A.  STANDARD OF REVIEW AND BACKGROUND LAW

"[T]his Court reviews due process claims, such as allegations of a *Brady* violation, de novo." *People v Dimambro*, 318 Mich App 204, 212; 897 NW2d 233 (2016).  Additionally, a "trial court's decision on a motion for new trial is reviewed for an abuse of discretion, which occurs when the trial court renders a decision falling outside the range of principled decisions." *Id*. (quotation marks and citation omitted).  We also review a trial court's denial of a motion for a mistrial for an abuse of discretion. *People v Dickinson*, 321 Mich App 1, 18; 909 NW2d 24 (2017).

The United States Supreme Court held in *Brady*, 373 US at 87, that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  In order to establish a *Brady* violation, defendant must establish that: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014).  "The government is held responsible for evidence within its control, even evidence unknown to the prosecution." *Id*. "Evidence is favorable to the defense when it is either exculpatory or impeaching." *Id*.

> To establish materiality, a defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  This standard "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ."  The question is whether, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  In assessing the materiality of the evidence, courts are to consider the suppressed evidence collectively, rather than piecemeal. [*Id*. at 150-151 (citations omitted; ellipsis in original).]

## B.  FACTUAL AND PROCEDURAL BACKGROUND

In this case, defendant's *Brady* claim involves three pieces of evidence that the prosecution did not provide to defendant until trial: certain medical records of the victim, a traffic citation issued to defendant, and certain bank records of the victim.  We begin our analysis by describing what occurred at trial with respect to each of these pieces of evidence.

### i. Medical Records

Defendant called Detective Renee Bondy, the officer in charge, to testify at trial. During the course of her direct testimony, Bondy testified that the victim was transported to the hospital on March 4, 2018, after having jumped out of the car. Bondy further indicated that she obtained medical records from the victim's hospitalization that she then turned over to the prosecution. The jury was excused, and the trial court asked Bondy to procure a copy of the medical records. Bondy located a copy of the medical records and provided it to defendant and his standby counsel. Defendant noted that the medical records consisted of 31 pages and immediately moved for a mistrial on the ground that the prosecution had denied defendant these records and the opportunity to cross-examine the victim on information in the medical records relevant to the alleged assaultive conduct.[4]

Reviewing the elements of a *Brady* claim, the trial court determined that the prosecution had suppressed the medical records but indicated that defendant had the burden to show that the suppressed material was exculpatory or impeaching and that defendant had been prejudiced by the prosecution's failure to produce the records. The trial court granted defendant's request for two hours to review the records with his standby counsel, after which defendant was to make any further requests for relief related to the medical records. The trial court also reviewed the medical records during this recess. After reviewing the records, defendant renewed his motion for a mistrial based on an alleged *Brady* violation. The trial court denied defendant's motion. The trial court concluded that alleged inconsistencies were not material, that the medical records were not admissible as evidence, and that it would not have ordered the records to be turned over to defendant had the prosecution timely presented them for an in camera review by the trial court.

### ii. Traffic Citation

During the prosecution's cross-examination of defendant at trial, defendant was asked about a trip to Ohio that he and the victim took in the middle of February 2018. Defendant testified that the victim drove to Ohio and that he drove most of the way back to Michigan. Defendant also testified that he received a speeding ticket in Ohio while he was driving on this trip. Defendant was not sure about the exact date, but he thought they drove back to Michigan on February 14. The prosecution admitted into evidence a copy of the traffic citation defendant received, which indicated that it was issued on the morning of February 13, 2018. Defendant indicated that he had no objection to the admission of this evidence. He subsequently asserted during a break that the prosecution committed a *Brady* violation by suppressing this evidence. The trial court denied defendant's motion for a dismissal or mistrial based on this alleged *Brady* violation because the traffic citation was originally issued to defendant and was not within the scope of defendant's discovery request.

---

[4] Defendant had moved the trial court before trial to compel discovery of the victim's medical records from this time period, referring to a police report indicating that the victim had signed a medical release form and arguing that the records should be used as evidence in the case. The prosecution indicated at the hearing on defendant's motion that it had already turned over all the medical records that it had.

### iii. Bank Records

Defendant testified during direct examination that he had purchased flowers for the victim the day before Valentine's Day using his own debit card. On cross-examination, defendant stated that this was wrong and that he had actually used the victim's debit card and reimbursed her. Defendant admitted that he "sometimes" used the victim's card at other times. He explained that the victim let him use her debit card when they went out for coffee so that it would appear that defendant was paying even though she wanted to pay. He claimed that he only used the victim's card for other things if his card was "maxed . . . out" or he was "strapped for cash." The prosecutor then referred to the victim's bank statement and asked defendant about various transactions at a casino, and defendant admitted that he had made those withdrawals. However, he claimed that he reimbursed the victim and that some of the withdrawals were repayments of money she owed him. Defendant also subsequently claimed that the suppression of these bank records constituted a *Brady* violation because they showed that a motel room was rented in Ohio on the night of February 12 and not the night of February 13 as the victim had claimed. The trial court denied defendant any relief on this ground because it concluded that the bank records were not exculpatory for defendant.

### iv. Posttrial Proceedings

After trial, defendant moved for a new trial, arguing in relevant part that he was entitled to a new trial because the prosecution had committed *Brady* violations by suppressing the victim's medical records, the traffic ticket, and the victim's bank records. As he had at trial, defendant argued that the medical records were material to his defense because they showed inconsistencies in the information that the victim provided the medical staff and inconsistencies between what she told the medical staff and her trial testimony, pertaining especially to the nature of her injuries, whether or not defendant had sexually assaulted her, and how fast the car was traveling when the victim jumped out. Defendant asserted that the records demonstrated that the victim's physical condition did not match the abuse that she claimed to have suffered and provided evidence that the victim was mentally unstable. Defendant argued that because credibility was critical in this case, had the prosecution produced the records in response to defendant's discovery request and had defendant been allowed to use them to demonstrate that the victim could not be believed, the outcome of the case likely would have been different.

Regarding the traffic ticket and the bank records, defendant insisted that they were covered by his discovery demands and that he could have used them to further challenge the victim's credibility by showing that these documents completely undermined the victim's testimony about when and why they went to Ohio and what happened while they were there. In defendant's view, the medical records, the traffic ticket, and the bank records were favorable to him because they provided exculpatory and impeaching evidence.

At the hearing on the motion, the trial court reaffirmed its earlier rulings and concluded that no *Brady* violations had occurred.

This Court subsequently granted defendant's motion to remand for the limited purpose of obtaining a missing portion of the trial transcript and moving for relief based on the alleged

improper nondisclosure of the traffic ticket and bank records.[5]  On remand, the trial court found there was no *Brady* violation and denied defendant's motion for a new trial.[6]

## C.  ANALYSIS

Turning to defendant's appellate arguments, we first address the traffic ticket.  Defendant argues on appeal that the prosecution withheld the traffic ticket from him and if it had been produced sooner, he could have used it on cross-examination of the victim to show she was wrong about her timeline regarding when they drove to Ohio.  However, as defendant acknowledged during his trial testimony, the traffic citation was issued to him.  Therefore, the prosecution did not prevent him from having this evidence and thus did not suppress it; defendant cannot rely on the traffic citation to establish a *Brady* claim.  *Chenault*, 495 Mich at 150.

Next, defendant claims that the medical records reflect that the victim had no injuries or injuries that were minor and inconsistent with her allegations regarding defendant's assaultive conduct.  Defendant appears to suggest that if the victim's allegations were true, she would have had more serious injuries when she presented to the hospital on March 4.  Defendant maintains that he could have used this information to impeach the victim's credibility on cross-examination if it had been timely produced by the prosecution.

Defendant's fundamental premise that a lack of more severe injuries documented in the medical records somehow casts doubt on whether he assaulted the victim as alleged is dubious.  The most severe injuries to which the victim testified had occurred approximately three weeks before the victim went to the hospital on March 4.  The medical records from March 4 contain documentation of pain in various places on the victim's body, as well as minor abrasions and bruising.  The documented injuries do not appear inherently inconsistent with the victim's testimony about defendant's assaults in this case.  Defendant also does not point to any specific testimony by the victim that he would have impeached with the medical records but instead appears to contend that he would have generally impeached her by hunting and pecking for any minor inconsistency on trivial details.  Regardless, injury is not an element of domestic assault and the prosecution therefore did not have to prove the extent of the victim's injuries.  See *People v Cameron*, 291 Mich App 599, 614; 806 NW2d 371 (2011) (stating with respect to the assault-or-batter element of domestic assault that "[i]t does not matter whether the touching caused an injury.").

Furthermore, to the extent defendant claims that if the medical records had been timely produced, he would have called the victim's treating physicians and other experts to opine on whether the victim's injuries were consistent with her claims, defendant has not provided any offer of proof indicating that he could actually have produced favorable testimony and instead relies on pure speculation.  Defendant's arguments regarding the medical records fail to establish that the medical records contained exculpatory or impeaching evidence and because he thus has not shown

---

[5] *People v Ramseur*, unpublished order of the Court of Appeals, entered June 9, 2020 (Docket No. 350192).

[6] The missing portion of the trial transcript has now been provided to this Court.

-15-

that the prosecution suppressed *favorable* evidence, he has not shown that a *Brady* violation occurred with respect to the medical records. *Chenault*, 495 Mich at 150.

Finally, regarding the bank records, defendant argues that they contradict the victim's timeline because she testified that defendant bought flowers with her debit card on February 14 and the bank records show a flower purchase on February 15. Even assuming that this discrepancy is not the result of a normal delay in formally processing the transaction, we fail to discern how this would create any exculpatory or impeachment evidence of any value in this case where the date on which defendant purchased flowers has nothing to do with the charged offenses. Defendant does not provide any explanation and seems to merely imply that if the victim did not remember this event correctly, then all of her allegations of defendant's criminal conduct are subject to doubt. We are aware that evidence may be favorable for purposes of *Brady* if the nondisclosure of evidence affects a witness's credibility and the reliability of that witness may be determinative of guilt or innocence, *id*., but the victim's reliability on the date she received flowers from defendant has no bearing on his guilt or innocence of the charged offenses in this case involving his assaultive conduct and attempts to prevent the victim from contacting the police. Any discrepancy in this respect would not have had any effect on her credibility. Under these circumstances, defendant's argument does not demonstrate that the bank record evidence was favorable to him. *Id*.

Finally, even if the medical records, traffic citation, and bank records could be considered favorable evidence that was suppressed by the prosecution, we would nonetheless conclude when considering all of this evidence together, as we must, *id*. at 150-151, that defendant has failed to demonstrate that this evidence was material. We cannot conclude that defendant did not receive a fair trial or that the verdict is not worthy of confidence based on the untimely disclosure of the above evidence when defendant relies merely on minor discrepancies in inconsequential details of the victim's story that had no bearing on whether defendant committed the charged criminal offenses. *Id*.

Defendant has failed to establish that a *Brady* violation occurred. Because the trial court's determination that there was no *Brady* violation was not erroneous, it did not abuse its discretion by denying defendant's motion for a mistrial and a new trial on the basis of alleged *Brady* violations.

## IV. OTHER-ACTS EVIDENCE

Next, defendant argues that the trial court erred by permitting the prosecution to introduce evidence that defendant had committed certain other acts of domestic violence.

### A. FACTUAL AND PROCEDURAL BACKGROUND

Before trial, the prosecution filed a notice of intent to introduce other-acts evidence under MRE 404(b) and/or MCL 768.27b that defendant had assaulted two of his former girlfriends. Specifically, the prosecution sought to introduce testimony that defendant had assaulted Kathryn Watson-Blackerby in 2004 when Watson-Blackerby tried to end her relationship with defendant and that this assault involved defendant attempting to suffocate Watson-Blackerby with a pillow, as well as choking her with his arm across her throat and his knee on her abdomen. The prosecution also sought to introduce testimony that defendant assaulted Emily Snow in 2014 during an

argument about defendant failing to help with bills and possibly pawning Snow's engagement ring. During this incident, defendant allegedly grabbed Snow, threw her around the basement, and choked her.

At the hearing on the motion, defendant expressly stated on the record that he had "no objection" to the evidence of the 2014 incident being admitted under MRE 404(b) or MCL 768.27b. However, defendant argued that evidence of the 2004 incident was inadmissible under MCL 768.27b because it occurred more than 10 years earlier and admitting that evidence would not be in the interest of justice. Defendant further argued that evidence of the 2004 incident was inadmissible under MRE 404(b) because it was not strikingly similar to the allegations for which he was on trial and because the danger of unfair prejudice outweighed the probative value under MRE 403. Essentially, defendant argued that the prosecution was attempting to improperly admit this evidence for propensity purposes. The prosecution maintained that evidence of the 2004 incident was admissible, arguing that the 2004 incident was sufficiently similar to the current allegations against defendant because both involved situations where defendant assaulted his partner after being told that the partner wished to end the relationship and both involved defendant choking his partner. The trial court, without indicating which rule justified admission of the evidence, ruled that the evidence was admissible as follows:

> Okay. I'll allow in the 2004 incident as being similar with the allegation it occurred over a breakup with the victim wanting to leave the relationship, and the Defendant being unwilling or not—not supporting ending the relationship and the strangulation.

At trial, Watson-Blackerby testified that she had previously been in a relationship with defendant and that they had a child. In July 2004, at which time Watson-Blackerby was pregnant with their child, Watson-Blackerby and defendant got into an argument when she told him that she wanted to end their relationship and wanted him to move out of her house. Watson-Blackerby testified that defendant had "moved himself in" without giving her much choice. She further testified that after she told defendant that she wanted to end the relationship, defendant got on top of her while she was lying in her bed, held her down with a knee to her chest, choked her, and put a pillow over her face so she could not breathe. After she was somehow pulled off the bed, defendant continued to try to choke her. He put one arm across her bottom jaw and the other across her forehead, and pulled her bottom jaw down so hard that it was choking her. Watson-Blackerby said that she was trying to scream, but defendant "grabbed another pillow to shut [her] up." Defendant told her not to scream and said, "I'll kill you." While this was going on, defendant told her that he was not going back to prison and that she would be sorry if she called the police. Watson-Blackerby stated that the abuse continued off and on from about midnight until 5:00 or 6:00 in the morning. When she tried to call for help, defendant "smashed" her face and squeezed her hands until her phone broke in her hand. Watson-Blackerby eventually convinced defendant to let her take him to the hospital for psychiatric treatment. At the hospital, a nurse called the police after seeing the cuts and bruises Watson-Blackerby had suffered.

Snow also testified at defendant's trial that she had been in a dating relationship with defendant and had a child with him. She testified that in June 2014, while she was pregnant with their child, she and defendant got into an argument about defendant not helping out equally, getting parking tickets in the car that was in her name, gambling, spending money, needing money, and

pawning Snow's engagement ring. She asked him to leave, and he suggested that she help him pack. Snow threatened to report the ring as stolen, and defendant responded by saying that she was risking his freedom and that she knew what he had to do. Defendant picked Snow up and threw her into some furniture and shelving. He then got on top of her and starting choking her. The police arrived after defendant left.

Defendant's posttrial motion for a new trial, which included a challenge to the admissibility of the other-acts evidence regarding the 2004 incident, was denied.

## B. STANDARD OF REVIEW

This Court reviews a trial court's decision to admit evidence for an abuse of discretion. *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017). "A trial court abuses its discretion when it chooses an outcome that falls outside the range of principled outcomes." *People v Rosa*, 322 Mich App 726, 732 n 3; 913 NW2d 392 (2018) (quotation marks and citation omitted). Whether a rule or statute precludes admission of the evidence is a question of law subject to de novo review. *Denson*, 500 Mich at 396. "A trial court necessarily abuses its discretion when it admits evidence that is inadmissible as a matter of law." *Id*.

## C. ANALYSIS

On appeal, defendant argues that the evidence of the 2004 incident was not admissible under MCL 768.27b because it occurred more than 10 years before the charged offense and admitting this evidence was not in the interest of justice.

MCL 768.27b provides in pertinent part:

(1) Except as provided in subsection (4), in a criminal action in which the defendant is accused of an offense involving domestic violence or sexual assault, evidence of the defendant's commission of other acts of domestic violence or sexual assault is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403.

\* \* \*

(4) Evidence of an act occurring more than 10 years before the charged offense is inadmissible under this section unless the court determines that 1 or more of the following apply:

\* \* \*

(d) Admitting the evidence is in the interest of justice.

This Court has explained that "MCL 768.27b provides that in domestic violence cases, evidence of other acts of domestic violence is admissible, even to show propensity, so long as admission of the evidence does not violate MRE 403 and the acts took place no more than 10 years before the charged offense." *Rosa*, 322 Mich App at 732. In *Rosa*, this Court construed the meaning of the phrase "in the interest of justice" for purposes of this statute, noting that the statute

-18-

did not define this phrase. *Id*. at 733. We held that in applying that provision of the statute, "evidence of prior acts that occurred more than 10 years before the charged offense is admissible under MCL 768.27b only if that evidence is uniquely probative if the jury is likely to be misled without admission of the evidence." *Id*. at 734.

In this case, the factual circumstances of the 2004 incident were exceedingly similar to the circumstances of the charged offenses in a number of significant ways. In both instances, defendant convinced his current partner to let him move into her home, and he became angry and physically assaultive after being told that the relationship was over and that he should move out. Both instances involved defendant choking or strangling the victim and also involved defendant attempting to prevent the victim from contacting police by resorting to threats, violence, and gaining control over the victim's phone.

Given the high degree of similarity between these incidents, not only in the actual physical assaults but also in the surrounding circumstances and relationship dynamics, this other-acts evidence was highly probative in demonstrating that defendant had a pattern of threatening and abusing women who tried to end relationships with him. This evidence was also highly relevant to rebutting defendant's claim in this case that he was the one trying to leave the relationship because the victim had deceived him about her HIV status,[7] his characterization of the alleged assaultive conduct as the result of consensual sexual activity or accident, and his claim that the victim fabricated the allegations.[8]

This Court previously stated that in enacting MCL 768.27b, the Michigan Legislature intended that juries would have "the opportunity to weigh a defendant's behavioral history and view the case's facts in the larger context that the defendant's background affords." *Cameron*, 291 Mich App at 609-610 (quotation marks and citation omitted). Accordingly, this Court held in *Cameron* that "prior-bad-acts evidence of domestic violence can be admitted at trial [under MCL 768.27b] because a full and complete picture of a defendant's history . . . tend[s] to shed light on the likelihood that a given crime was committed." *Id*. at 610 (quotation marks and citation omitted; ellipsis and second alteration in original).

We recognize that when the prior act occurred more than 10 years before the charged offense, however, the prior-act evidence must be something more than merely probative of the defendant's propensity in order to satisfy the standard that the evidence is "admissible under MCL 768.27b only if that evidence is uniquely probative if the jury is likely to be misled without

---

[7] Defendant indicated on the record at the motion hearing that this claim formed part of his defense in the context of opposing the prosecutions' motion in limine to preclude evidence of the victim's medical condition. The other-acts motion was addressed later at the same hearing.

[8] Defendant also made this claim in the context of the same argument discussed in the previous footnote.

admission of the evidence." *Rosa*, 322 Mich App at 733-734.[9] In *Rosa*, we held that the prior-act evidence at issue did not satisfy this standard, explaining as follows:

> [T]he testimony of defendant's first wife concerning events that occurred at least 16 years before the charged crimes was not uniquely probative. KR's testimony laid out a detailed and compelling picture of defendant as an abusive and violent husband. She described repeated verbal abuse, multiple beatings, and a rape. The older son described threatening and violent behavior as well. The prior bad acts described by defendant's first wife were neither uniquely probative nor were they needed to ensure that the jury was not misled; instead, the acts were consistent with and cumulative to KR's testimony regarding defendant's character and propensity for violence. [*Id*. at 734.]

In this case, unlike the circumstances in *Rosa*, there was no other eyewitness testimony who had seen the alleged physical assaults by defendant against the victim or who could testify about the day-to-day dynamics of defendant's relationship with the victim. The prosecution's only witnesses were the victim and the two former girlfriends of defendant. In light of the relatively short duration of defendant's relationship with the victim, the lack of witnesses to the alleged assaultive conduct and the dynamics of the parties' cohabitation and relationship, and the nature of defendant's defense to the charges, the prior-acts evidence in this case was particularly probative with respect to the jury's assessment of the conflicting stories advanced by the victim and defendant. Under these circumstances, we conclude that the evidence of the 2004 incident from more than 10 years earlier—especially considering its striking similarity to the charged offenses—met the standard for admissibility under the interest-of-justice exception in MCL 768.27b(4)(d) because it was uniquely probative and the jury would have likely been misled without this evidence. *Rosa*, 322 Mich App at 734.

However, this conclusion does not end our analysis of the issue. Defendant further argues that the evidence of the 2004 incident should have been excluded under MRE 403 for being "substantially more prejudicial than probative." Admissibility under MCL 768.27b is also subject to MRE 403 pursuant to the express statutory language. MCL 768.27b(1); *Rosa*, 322 Mich App at 732. Under MRE 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or

---

[9] This Court explained:

[I]f we read the interest-of-justice exception to apply merely because the evidence is probative of defendant's propensities and it survives MRE 403 review, the 10–year limitation would have no meaning. All evidence admitted under MCL 768.27b, including evidence of acts falling within the 10–year window must be probative and must not violate MRE 403. Thus, to define "interest of justice" by such a standard would mean that evidence of prior acts that occurred more than 10 years before the charged offense would be admissible simply by showing that the evidence would be admissible if it had occurred within the 10–year window. This would render the 10–year limit essentially nugatory, and it is well settled that we must "avoid a construction that would render any part of the statute surplusage or nugatory." [*Rosa*, 322 Mich App at 733-734 (citation omitted).]

-20-

by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The MRE 403 balancing test requires this Court to first determine whether the introduction of the prior-acts evidence "was unfairly prejudicial" and then "weigh the probativeness or relevance of the evidence against the unfair prejudice." *Cameron*, 291 Mich App at 611 (quotation marks and citation omitted).

With respect to the first inquiry:

The "unfair prejudice" language of MRE 403 refers to the tendency of the proposed evidence to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock. Moreover, admission of [e]vidence is unfairly prejudicial when . . . [the danger exists] that marginally probative evidence will be given undue or preemptive weight by the jury. [*Cameron*, 291 Mich App at 611 (citations and some quotation marks omitted; ellipsis and alterations in original).]

In this case, defendant has not shown that the other-acts evidence of the 2004 incident was *unfairly* prejudicial. At most, the prejudice of which defendant complains stems from the defendant's conduct in physically assaulting his pregnant girlfriend. However, evidence that is otherwise admissible for a proper purpose—as this other-acts evidence was—is "not rendered inadmissible [under MRE 403] merely because it brings vividly to the jurors the details of a gruesome or shocking accident or crime." *Head*, 323 Mich App at 541 (quotation marks and citation omitted). "All relevant evidence is prejudicial to some extent." *Id*. Here, the other-acts evidence did not inject extraneous conditions designed to arose bias, sympathy, or shock among the jurors and therefore was not unfairly prejudicial. *Cameron*, 291 Mich App at 611. Furthermore, the other-acts evidence had a high probative value, as previously discussed, and its probative value was not substantially outweighed by a danger of unfair prejudice.[10] MRE 403. The admission of the evidence of the 2004 incident did not constitute an abuse of discretion.[11] *Denson*, 500 Mich at 396.

---

[10] The jury acquitted defendant of one charge of domestic violence, which also suggests that the other-acts evidence did not create unfair prejudice.

[11] Because this evidence was admissible under MCL 768.27b, we need not address defendant's argument that it was inadmissible under MRE 404b. See *People v Railer*, 288 Mich App 213, 219-220; 792 NW2d 776 (2010) ("Under MRE 404(b), the prosecution may not present evidence of a defendant's other crimes, wrongs, or acts in order to show a defendant's propensity to commit a crime. Notwithstanding this prohibition, however, in cases of domestic violence, MCL 768.27b permits evidence of prior domestic violence in order to show a defendant's character or propensity to commit the same act.") (citation omitted).

Furthermore, because propensity is a proper purpose under MCL 768.27b, see *Rosa*, 322 Mich App at 732, we also need not consider defendant's additional arguments in which he seems to suggest that the only purpose for introducing the evidence of the 2004 incident was to invite the jury to improperly make a propensity inference.

Defendant also briefly argues on appeal that the evidence of the 2014 incident should have been excluded under MRE 403. However, defendant expressly conceded in the trial court that this evidence was admissible and thereby waived this claim of error for appellate review.

"Waiver has been defined as the intentional relinquishment or abandonment of a known right." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (quotation marks and citation omitted). "One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *Id*. (quotation marks and citation omitted). A defendant's clear expression of satisfaction with a decision by the trial court constitutes a waiver. *Id*. at 219.

In this case, defendant affirmatively stated on the record at the hearing on the prosecution's motion to introduce other-acts evidence that he had "no objection" to the admissibility of the evidence of the 2014 incident under MCL 768.27b or MRE 404(b). Our Supreme Court has held that informing the trial court, "I have no objections," qualifies as an "express and unequivocal" indication of approval sufficient to constitute a waiver of an appellate issue. *People v Kowalski*, 489 Mich 488, 505; 803 NW2d 200 (2011). Thus, defendant waived his challenge to the admissibility of the evidence of the 2014 incident. *Id*.; *Carter*, 462 Mich at 215, 219. A defendant "may not harbor error as an appellate parachute." *Carter*, 462 Mich at 214.

Defendant has not shown any error regarding the admission of other-act evidence.

V. CUMULATIVE ERROR

Because defendant has not demonstrated the occurrence of any error with respect to defendant's *Brady* issue or other-acts evidence issue, defendant's argument that the cumulative effect of these alleged errors violated his due process rights is unavailing. "Absent the establishment of errors, there can be no cumulative effect of errors meriting reversal." *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007).

VI. SUFFICIENCY OF THE EVIDENCE

Defendant further contends that the evidence was insufficient to support his conviction for witness intimidation in violation of MCL 750.122 because defendant's alleged conduct did not interfere with the victim's ability to testify in an "official proceeding" as defined by the statute.

This Court reviews challenges to the sufficiency of the evidence de novo, considering the evidence in a light most favorable to the prosecution and resolving conflicting evidence in its favor, to "determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond reasonable doubt." *People v Ericksen*, 288 Mich App 192, 195-196; 793 NW2d 120 (2010). We also review de novo, as questions of law, the interpretation and application of a statute. *People v Hock Shop, Inc*, 261 Mich App 521, 524: 681 NW2d 669 (2004).

Defendant was convicted of violating MCL 750.122 by using threat or intimidation.[12] The portion of MCL 750.122 relevant to our discussion provides as follows:

(3) A person shall not do any of the following by threat or intimidation:

(a) Discourage or attempt to discourage any individual from attending a present or future official proceeding as a witness, testifying at a present or future official proceeding, or giving information at a present or future official proceeding.

(b) Influence or attempt to influence testimony at a present or future official proceeding.

(c) Encourage or attempt to encourage any individual to avoid legal process, to withhold testimony, or to testify falsely in a present or future official proceeding.

* * *

(9) This section applies regardless of whether an official proceeding actually takes place or is pending or whether the individual has been subpoenaed or otherwise ordered to appear at the official proceeding if the person knows or has reason to know the other person could be a witness at any official proceeding.

* * *

(12) As used in this section:

(a) "Official proceeding" means a proceeding heard before a legislative, judicial, administrative, or other governmental agency or official authorized to hear evidence under oath, including a referee, prosecuting attorney, hearing examiner, commissioner, notary, or other person taking testimony or deposition in that proceeding.

In this case, the prosecutor argued during closing argument that defendant committed this crime by attempting to send a text message on the victim's cell phone to all of her contacts revealing her affair with defendant, and including a nude picture of the victim with the text, while the victim was attempting to call the police after she had jumped out of the car on March 4. Defendant argues on appeal that there were no allegations that he made any threats after court

---

[12] There are other ways in which a person may commit witness tampering in violation of this statute, but they are not at issue in this case. See, e.g., *People v Greene*, 255 Mich App 426, 438; 661 NW2d 616 (2003) ("In the most general sense, the Legislature identified four different categories of witness tampering [in MCL 750.122]: bribery (subsection 1), threats or intimidation (subsection 3), interference (subsection 6), and retaliation (subsection 8).").

proceedings were initiated. The sole basis on which defendant challenges his conviction under this statute is his claim that the statute requires the alleged offense conduct to have been committed after court proceedings had been initiated and that any conduct committed before that time, such as the conduct at issue in this case that occurred before and during the victim's 911 call, does not violate MCL 750.122. According to defendant, the definition of "official proceeding" in MCL 750.122(12)(a) "does not include the initial stages of a criminal investigation – like reporting a crime to a police officer – and is limited to proceedings that are held where an individual takes an oath and provides testimony." Defendant maintains that even if the victim's testimony is accepted as true, it only established that defendant may have interfered with the reporting of a crime to a police officer and such conduct does not violate MCL 750.122.

This Court has explained that MCL 750.122 reflects "an attempt to identify and criminalize the many ways individuals can prevent or attempt to prevent a witness from appearing and providing truthful information in some sort of official proceeding, as defined in subsection 12(a)." *People v Greene*, 255 Mich App 426, 438; 661 NW2d 616 (2003). Defendant's appellate argument ignores MCL 750.122(9), which states that "[t]his section applies regardless of whether an official proceeding actually takes place or is pending or whether the individual has been subpoenaed or otherwise ordered to appear at the official proceeding if the person knows or has reason to know the other person could be a witness at any official proceeding." Thus, under the plain language of the statute, the fact that defendant's alleged threatening and intimidating behavior occurred before this criminal action was initiated does not prevent him from being found to have violated MCL 750.122. Clear statutory language must be enforced as written. *People v Dowdy*, 489 Mich 373, 379; 802 NW2d 239 (2011). Defendant would have had reason to know that the victim could be a witness an official proceeding as that term is defined in subsection 12(a) if she reported assaultive or other criminal conduct committed by defendant against her to the police. MCL 750.122(9).

Moreover, we find persuasive the analysis in *People v Papineau*, unpublished per curiam opinion of the Court of Appeals, issued May, 31, 2005 (Docket No. 254240), pp 2-3, in which another panel of this Court addressed essentially the same argument defendant now raises in the present case. In *Papineau*, the defendant argued

> that the evidence was insufficient to establish that his conduct was designed to affect testimony at an "official proceeding" because defendant's alleged threat to have his friends in the sheriff's department help him get the victim committed to a psychiatric ward was made a few days after the victim was assaulted and no proceedings were pending against defendant at that time. Defendant further allege[d] that his intent in making the statements to the victim was to avoid, rather than influence, any "official proceedings" and that because his comments were made before the pendency of any official proceedings, any contention that he intended to affect the victim's in-court testimony is merely speculative. [*Id*. at 2.]

Citing MCL 750.122(9), this Court rejected the defendant's argument and explained that "[t]he plain language of the statute does not require the pendency of an official proceeding as an element of the offense." *Id*. The Court also reasoned that it could "be inferred that defendant, as the perpetrator of the assault against the victim, either knew or had reason to know of the possibility of future judicial proceedings as a result of the assault." *Id*. at 2-3. Finally, this Court "reject[ed] defendant's contention that he could not have been on notice of the possibility of a judicial

proceeding until he was arrested or until the institution of formal proceedings against him at an arraignment" because "MCL 750.122, as written, does not include a provision defining the moment when a person knows or has reason to know that another person could be a witness at any official proceeding." *Id*. at 3.

We find the above analysis persuasive in supporting our conclusion in this case.[13] Defendant's appellate argument, which primarily involves matters of statutory interpretation and application, does not demonstrate that the evidence was insufficient to support his conviction under MCL 750.122.

## VII. SENTENCING

Defendant next asserts that he is entitled to resentencing because he was not properly informed of his sentencing exposure under the habitual-offender statute.

This Court reviews de novo whether a defendant was properly apprised of the applicability of habitual-offender enhancements, including the interpretation and application of relevant statutes and court rules. *People v Head*, 323 Mich App 526, 542; 917 NW2d 752 (2018).

Regarding a prosecutor's notice of intent to seek a habitual-offender sentence, MCL 769.13 provides in pertinent part as follows:[14]

> (1) In a criminal action, the prosecuting attorney may seek to enhance the sentence of the defendant as provided under section 10, 11, or 12 of this chapter, by filing a written notice of his or her intent to do so within 21 days after the defendant's arraignment on the information charging the underlying offense or, if arraignment is waived, within 21 days after the filing of the information charging the underlying offense.

> (2) A notice of intent to seek an enhanced sentence filed under subsection (1) shall list the prior conviction or convictions that will or may be relied upon for purposes of sentence enhancement. The notice shall be filed with the court and served upon the defendant or his or her attorney within the time provided in subsection (1). The notice may be personally served upon the defendant or his or her attorney at the arraignment on the information charging the underlying offense,

---

[13] While unpublished opinions are not binding, an unpublished opinion may be considered for its persuasive value. See *People v Green*, 260 Mich App 710, 720 n 5; 680 NW2d 477 (2004).

[14] MCR 6.112(F) also involves the notice of intent and provides as follows:

> A notice of intent to seek an enhanced sentence pursuant to MCL 769.13 must list the prior convictions that may be relied upon for purposes of sentence enhancement. The notice must be filed within 21 days after the defendant's arraignment on the information charging the underlying offense or, if arraignment is waived or eliminated as allowed under MCR 6.113(E), within 21 days after the filing of the information charging the underlying offense.

or may be served in the manner provided by law or court rule for service of written pleadings. The prosecuting attorney shall file a written proof of service with the clerk of the court.

"The purpose of the notice requirement is to provide the accused with notice, at an early stage in the proceedings, of the potential consequences should the accused be convicted of the underlying offense." *Head*, 323 Mich App at 543 (quotation marks and citation omitted).

In this case, defendant asserts that there is "no evidence" that he "was ever served with a copy of the habitual offender notice . . . because there is no proof of service in the court file and no entry in the register of actions reflecting the filing of a proof of service." The lower court file contains a habitual offender notice indicating that defendant was being charged as a fourth-offense habitual offender, listing the prior convictions relied on by the prosecution, and indicating the enhanced penalties applicable to defendant. Although there does not appear to be a proof of service in the lower court file for habitual offender notice, the register of actions indicates that a proof of service was filed concurrently with the habitual offender notice. Defendant does not claim that he did not actually receive the habitual offender notice and expressly concedes in his appellate brief that "the prosecution complied with the notice requirement in this case."

Thus, defendant does not appear to be arguing that there was actually a lack of notice with respect to the habitual-offender enhancement in this case. Instead, the essence of defendant's argument seems to be his claim that the notice was "inadequate" to inform him of his potential maximum sentence because the trial court consistently informed him on the record that his maximum potential sentence was 10 years when he was actually subject to a potential life sentence with the fourth-offense-habitual-offender enhancement. Defendant asserts that the trial court's "misrepresentations of his maximum sentence were never corrected at any point in the proceedings so that [defendant] would become aware of the fact that he actually faced a maximum penalty of life in prison."

However, the habitual-offender notice provided defendant with written notice that he was subject to a potential maximum sentence of life imprisonment. Defendant does not provide any explanation how the trial court's misstatements that contradicted the written habitual-offender notice prejudiced him in light of the written notice that he does not deny having actually received. Hence, any alleged error that may have occurred relative to the habitual-offender notice in this case was harmless under these circumstances. See *Head*, 323 Mich App at 543-544 ("The failure to file a proof of service of the notice of intent to enhance the defendant's sentence may be harmless if the defendant received the notice of the prosecutor's intent to seek an enhanced sentence and the defendant was not prejudiced in his ability to respond to the habitual-offender notification.").[15]

---

[15] We additionally note that defendant received a maximum sentence of 15 years' imprisonment in this case.

Defendant has not demonstrated that he did not actually have timely notice of the potential consequences he faced if convicted. See *id.* at 543.[16]

Affirmed.

/s/ Stephen L. Borrello
/s/ Colleen A. O'Brien

---

[16] Moreover, defendant has not cited any legal authority to support his contention that a trial court's misstatements about potential penalties that contradict the written notice of the intent to seek the habitual-offender enhancement entitle defendant to resentencing. Thus, this argument is also abandoned. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *Head*, 323 Mich App at 546 (quotation marks and citation omitted).